THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
DONALD NICHOLL, Defendant-Appellant.

Second District   No. 2—89—0278

Opinion filed March 21, 1991.—Rehearing denied April 25, 1991.

G. Joseph Weller and Patrick M. Carmody, both of State Appellate Defender's Office, of Elgin, for appellant.

Michael P. Coghlan, State's Attorney, of Sycamore (William L. Browers and Lawrence M. Bauer, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE McLAREN delivered the opinion of the court:

Defendant, Donald Nicholl, appeals from his conviction of aggravated criminal sexual abuse. Defendant contends: (1) the court erred in

admitting the testimony of two witnesses not listed in discovery; (2) the court erred by not allowing evidence of a subsequent false accusation and evidence of the possibility of a different perpetrator of the abuse; (3) he was not proved guilty beyond a reasonable doubt; and (4) the court erred by ordering the defendant to pay the victim's mother's attorney fees in connection with a petition to change the visitation rights of her ex-husband, who lived with defendant. We affirm in part, reverse in part, and remand.

Defendant was charged with aggravated criminal sexual abuse. (Ill. Rev. Stat. 1987, ch. 38, par. 12—16(c)(1).) The information alleged that "defendant intentionally touched the breasts of the victim for the purpose of sexual gratification." A hearing was held pursuant to which the victim, five-year-old J.C., was found to be competent to testify at trial.

J.C. lived with his mother, Julie, and her husband, Doug. The defendant lived with J.C.'s father and Julie's ex-husband, Edward. The alleged incident of abuse occurred on July 11, 1987, during a period of scheduled visitation as set forth in Julie's and Edward's divorce decree.

At trial, J.C. testified that defendant "sucked to my boobies." J.C. stated he was watching Donald Duck on television when the incident occurred. J.C. also stated defendant touched and sucked J.C.'s penis. Using anatomically correct dolls, J.C. demonstrated the actions which he testified to. J.C. stated the only thing his mother told him was to tell the truth. J.C. also denied that Doug told him what to say to the judge.

On cross-examination, J.C. testified Edward was not his father. J.C. stated the alleged incident of abuse took place while he was watching television and Edward and Erica, Edward's girlfriend, were sleeping. J.C. further testified the incident began at 12:27 and concluded at 9:30. J.C. stated Edward did not witness the incident. J.C. also stated the incident occurred on a Tuesday. (July 11, 1987, was a Saturday.)

J.C. further testified he had lunch and dinner at his mother's house on the day of the incident. J.C. also stated he went swimming at his grandmother's house on that day. J.C. stated that he was at his grandmother's "sometime around daytime or nighttime."

J.C. testified he had never met defense counsel before although it is apparent from the record he had. Initially, J.C. denied talking to the police about the incident but later admitted he had. J.C. acknowledged he told the police the incident occurred during the day and defendant did not have any clothes on at the time. J.C. also remembered telling

the police Edward witnessed the incident and Edward killed defendant. J.C. admitted this did not actually happen.

The State then called Pat Graham-Toohey as a witness. Defendant objected on the basis Graham-Toohey was not included as a witness in responses to discovery. The court allowed defendant to speak to Graham-Toohey over the lunch break. The court then permitted Graham-Toohey to testify as a corroborative complaint witness.

Graham-Toohey testified she has been employed by the Family Advocate for 11 years. She stated she interviewed J.C. on four separate occasions. During each interview, J.C. told Graham-Toohey someone had sucked his "boobies" and played with his penis. On cross-examination Graham-Toohey acknowledged J.C. never indicated when these alleged incidents occurred.

Ronald Kestner, a special agent with the Illinois State Police, also testified he had interviewed J.C. Kestner stated J.C. told him someone had sucked hard on his nipples and penis. Kestner also testified J.C. indicated the incident occurred while he was in his father's bed watching television.

Sidella Hughes, an investigator with the Department of Children and Family Services (DCFS), testified she interviewed J.C. on July 14, 1987. Hughes stated J.C. told her someone sucked his "boobies" and hair. In a subsequent interview 90 minutes later, J.C. stated someone had also sucked his penis. Hughes further testified J.C. told her Edward witnessed this incident.

Carl Pool, a DCFS employee, was also a witness the State failed to list in discovery but called at trial. Defendant was given an opportunity to speak with Pool prior to his testimony. Pool testified he also participated in the investigation of the alleged abuse. J.C. told Pool a man had sucked his "boobies" and penis. Pool also testified J.C. indicated Edward had observed the sexual activity, slammed defendant's head against the wall, and kicked defendant out of the house.

Doug, J.C.'s mother's husband, testified that when J.C. returned home from Edward's, J.C. complained his legs and "boobies" hurt. J.C. seemed most concerned with his legs. While bathing the next morning, J.C. again complained his "boobies" hurt. At that time, Doug noticed J.C.'s nipples were skinned and red. J.C. then told Doug defendant had sucked his "boobies." After lunch, Doug suggested to J.C.'s mother that DCFS should be contacted.

Julie, J.C.'s mother, testified that, on July 10, 1987, Edward, Julie's ex-husband, picked up J.C. for a weekend visit. Edward brought J.C. home Sunday evening at approximately 8:30. Julie stated J.C. was very tired, and she carried him into the house. J.C. sat down on the

floor and showed her some bruises on his legs. Julie testified J.C. told her Edward had kicked him in the legs. J.C. also briefly complained his chest hurt. Later that night, J.C. had fallen asleep in the car while returning home from getting ice cream. Julie carried J.C. into the house and undressed him to get him ready for bed. She left the lights off so as not to wake J.C. Julie dressed J.C. in his pajamas. J.C. woke up and asked Julie to read him a story, which she did.

The following morning, Julie got J.C. ready for a bath. She noticed J.C.'s nipples were swollen, red, bruised and had dried blood on them. J.C. told Julie his nipples hurt and defendant had sucked on them. Julie testified she discussed this allegation with Doug and then went to work. She returned home at lunch and called the child abuse hotline. The next day a representative of DCFS returned her call, and she met with Sidella Hughes at Doug's grandmother's home. Later, she went to a DCFS office so J.C.'s nipples could be photographed. Julie testified J.C. then spoke to Agent Kestner and Dr. Baptist. Both of these individuals told Julie they thought it was a case of sexual abuse.

Julie denied causing the injuries to J.C.'s nipples. Julie also testified she did not tell J.C. what to say in court but only to tell the truth.

On cross-examination, Julie acknowledged she waited six hours after J.C. had told her about the alleged abuse to call DCFS. Julie admitted J.C. spent the morning alone with Doug. Julie also testified she had an appointment with her doctor that evening and, while she brought J.C. with her to that appointment, she did not ask her doctor to examine J.C.'s nipples.

Julie testified Edward and defendant lived together prior to her marriage to Edward, and she did not like the arrangement. Julie acknowledged she had made two previous complaints to DCFS concerning abuse. She also complained to the court previously about Edward's violation of a court order. Julie denied these complaints were an attempt to gain an advantage in limiting Edward's visitation rights.

Dr. Erroll Baptist testified he examined J.C. on July 14, 1987. Dr. Baptist stated he was aware there was a possibility of abuse prior to conducting the examination. Julie and Dr. Baptist's nurse were present during the examination. Dr. Baptist testified J.C.'s breasts were enlarged, swollen and discolored. A further examination with a magnifying glass disclosed dried blood in the cracks of J.C.'s nipples. Dr. Baptist estimated the injury to J.C.'s breasts had not occurred within 24 hours of the examination, but it had occurred within four or five days of the exam. J.C. told Dr. Baptist defendant had touched J.C. on the penis and "boobies." Dr. Baptist opined J.C. had been sexually abused.

Dr. Baptist was shown an inner tube used by J.C. while swimming, and Dr. Baptist stated it was very unlikely the tube caused J.C.'s injuries.

On cross-examination, Dr. Baptist stated the injuries could have been inflicted within 36 to 48 hours of his examination. Dr. Baptist also stated J.C. would have been in pain at the moment the injury occurred or shortly thereafter.

The State then rested its case.

Erica Erickson testified for defendant. She stated she was living with Edward and defendant during the relevant time period. She testified she returned from work at approximately 10:45 p.m. on July 10, 1987, and J.C., Edward and defendant were all there. J.C. was asleep in Edward's bedroom. On Saturday, July 11, Erica made J.C. breakfast, and J.C. watched television in the living room. Erica and Edward played with J.C. that morning. J.C. did not tell Erica his chest or anything else hurt. Erica testified defendant returned from work at approximately 1:30 and took a shower. Edward's brother Bob arrived at approximately 2:15, and Erica left for work one hour later. Erica testified she did not observe any sexual contact between J.C. and defendant that afternoon.

Erica testified she arrived home from work at approximately 10:45 p.m. and observed J.C. and Edward sleeping in Edward's bedroom. Defendant was sleeping in another bedroom. Erica went to sleep on the couch. Erica awoke at approximately 8:30 and drank coffee with defendant until he went to church at approximately 9 a.m. J.C. and Edward were watching cartoons on television. Erica testified defendant returned from church at approximately 10:45, and then everyone watched television. Erica stated she did not see J.C. have any physical contact with defendant during this time.

Erica further testified that J.C. and Edward left at approximately 12 noon and went to a movie. They returned at approximately 4 p.m. Erica and Edward then took J.C. to play miniature golf. She and Edward returned J.C. to his mother at approximately 7 p.m. Erica testified J.C. appeared to be happy when he got out of the car.

Erica further testified she observed J.C.'s chest while he was playing in the yard on July 11, and she did not see any swelling, bruising or blood. She did not observe any sexual contact between J.C. and the defendant and did not see Edward hit the defendant during the weekend.

Robert C., Edward's brother, also testified for the defendant. Robert stated that he visited his brother on July 11, arriving at approximately 1:30 p.m. He remained at Edward's home until approximately 4:30. Robert testified he did not observe any sexual abuse. He

further stated he did not see Edward strike defendant or kick him out of the house. Robert stated he observed J.C. without his shirt on and did not see any bruising or swelling in the breast area. Robert testified J.C. appeared to be having fun throughout the day.

Mary C., Edward's stepmother and J.C.'s step-grandmother, testified she saw J.C. on July 11. J.C. came over with Edward and defendant to swim and eat dinner. J.C. was wearing a swimsuit. J.C. swam and used an innertube. Mary testified the innertube had tape over the valve so it would not scratch the user. While helping J.C. take the innertube off, she observed his bare chest and did not see any marks, blood, bruising or swelling. Mary also stated J.C. was in a fantastic mood. She testified she did not observe any sexual contact between J.C. and defendant.

Jamie Carroll and Albert C. were also present at the pool on July 11. Both witnesses testified they did not observe defendant sexually abuse J.C.

Edward testified he picked up J.C. for visitation on July 10, 1987. They returned home at approximately 9 p.m. and watched television. Edward denied defendant was in the room where J.C. was sleeping or had any contact with J.C. that night.

Edward testified defendant was not home when J.C. and Edward awoke the next morning. Edward testified defendant returned home from work at approximately 1:30 p.m. At approximately 4:15, the group went to Edward's father's home to go swimming. Edward observed no unusual marks on J.C.'s nipples when putting J.C.'s shorts on. Edward identified the innertube J.C. was using that day. Edward did not observe any sexual contact between J.C. and defendant that day. Edward testified that he, J.C. and the defendant returned home at approximately 10 p.m. They all went to bed immediately.

Edward testified the next morning when he and J.C. awoke, Erica and defendant were already awake. Erica fixed breakfast while defendant prepared to go to church. Defendant returned from church at approximately 11 a.m. Edward testified he took J.C. to get a hamburger, and then they went to a movie. Edward and J.C. returned home at approximately 3 p.m. Edward testified that he, J.C. and Erica then went to play miniature golf. Edward testified he and Erica drove J.C. back to Julie's home, arriving at approximately 7 p.m. Edward denied having a physical confrontation with defendant or throwing him out of the house.

Defense counsel then asked Edward where he was on Thanksgiving Day 1987. The State objected, arguing this information was irrelevant. The court sustained the objection but allowed the defendant to

make an offer of proof. The offer of proof established Edward was with J.C. at all times, and defendant had absolutely no contact with J.C. on that day.

Another offer of proof was placed in the record showing that, if allowed, Edward would testify Julie had threatened defendant with retribution on numerous occasions.

Judith Free, a DCFS employee, testified she interviewed J.C. on December 4, 1987, pursuant to a complaint of sexual abuse. The incident allegedly occurred on Thanksgiving Day in 1987. When asked to reveal what J.C. told her during her interview, the State objected, claiming the testimony was irrelevant. The court sustained the objection, and the defendant made an offer of proof. The offer of proof indicated, if allowed to testify, Free would state she determined the complaint was unfounded. She based her finding on the fact J.C. repeatedly stated in the interview his mother had told him what had taken place. J.C. had no independent recollection of the alleged incident.

Rebecca Gordon, an employee of the Family Service Agency, was present during a conversation between defense counsel and J.C. on January 30, 1988. Gordon testified J.C. told defense counsel the alleged incident took place at Grandma Mary's pool. J.C. specifically denied the incident took place at Edward's home. J.C. also stated the incident occurred during the daytime. Gordon testified J.C. stated Edward saw the defendant performing the sexual act and asked defendant to get out of the house.

Dr. Edward Hirsch testified he examined Dr. Baptist's report regarding the alleged incident. Dr. Hirsch opined that, based upon Dr. Baptist's report, J.C.'s injuries must have occurred within 24 hours of Dr. Baptist's examination. Dr. Hirsch opined it is possible but unlikely the injuries occurred up to 36 hours prior to the examination, and it was impossible the injuries were sustained more than 48 hours prior to Dr. Baptist's examination. This opinion was based upon the lack of any notation indicating bruising of the nipples. Dr. Hirsch testified if there was enough force to create an injury visible more than 36 hours later, there would have to be bruising of the chest in addition to the redness and swelling noted.

Defendant testified he was living with Edward and Erica during July of 1987. His testimony concerning the events of the weekend of July 10 was consistent with the other witnesses. Defendant denied having any contact of a sexual nature with J.C. during the weekend. Defendant also denied he had any sort of physical confrontation with Edward during the weekend. Defendant also denied seeing J.C. on

Thanksgiving Day in 1987. Defendant further testified Julie had told him numerous times she would "get him."

In rebuttal, Robert Hollenbeck, also a DCFS employee, testified he interviewed J.C. on September 7, 1986. This interview was in response to an allegation of sexual abuse. J.C. told Hollenbeck the abuse had occurred during the previous day at his father's home. J.C. was not specific as to who committed the act of abuse, and Hollenbeck acknowledged the outcome of the investigation was that the allegation was unfounded.

Closing arguments were heard, and the court found defendant guilty.

On August 11, 1988, the court conducted a hearing on defendant's motion for a new trial. The court denied defendant's motion. The court then heard testimony regarding sentencing. The court sentenced defendant to a three-year term of probation and imposed a $3,500 fine plus costs. The court also ordered defendant to pay restitution to Julie including $750 in attorney fees expended by Julie to contest the visitation rights of Edward based upon this incident.

On October 5, 1988, the court conducted a hearing on defendant's motion to reconsider. In this motion, defendant objected to, *inter alia,* the restitution order. Julie testified as to attorney fees she incurred subsequent to the sexual abuse allegations due to her attempt to change her visitation agreement with Edward. The court modified the restitution order to $1,000 for legal services rendered by attorney Nancy Mindrup in connection with the sexual abuse of J.C. Defendant timely appeals.

We first address defendant's contention the court erred by allowing Graham-Toohey and Pool to testify after it was established they were not included on the witness list provided by the State. Defendant argues their testimony was cumulative.

■ It is within the trial court's discretion to allow an unlisted witness to testify at trial. (*People v. Zarebski* (1989), 186 Ill. App. 3d 285, 290.) An abuse of discretion occurs when the record demonstrates the defendant was surprised or prejudiced by the testimony. (*Zarebski*, 186 Ill. App. 3d at 290.) The defendant has the burden of establishing surprise or prejudice. *Zarebski*, 186 Ill. App. 3d at 290.

■ In the case at bar, the trial court gave the defendant the opportunity to interview both of the unlisted witnesses once it was learned they would be called to testify. Defendant did so and was able to determine the nature of their testimony. The testimony consisted of recounting what J.C. had told each witness shortly after the alleged incident took place. The testimony was similar to other evidence pre-

sented, and defendant was able to fully cross-examine each witness. Defendant has not established he was prejudiced by the nondisclosure of the witnesses prior to trial. The court did not abuse its discretion in allowing Graham-Toohey and Pool to testify.

Defendant also claims the court erred by allowing the details of J.C.'s complaints to be recounted by the corroborative complaint witnesses. The State counters by claiming that the statute in effect at the time of trial allows such details to be admitted.

■■ The version of section 115—10 of the Code of Criminal Procedure of 1963 in effect at the time of trial clearly allows a witness to testify to details of any complaint made by the victim. (See Ill. Rev. Stat. 1987, ch. 38, par. 115—10(a)(2).) This court has agreed with the State's argument holding that section 115—10 concerns trial procedures rather than substantive matters, and, therefore, the more recent version of the statute applies at trial. (*People v. Priola* (1990), 203 Ill. App. 3d 401, 417-18.) The court did not err by allowing the various witnesses to testify as to the specifics of what J.C. told them.

■■ Defendant next contends the court erred by not allowing testimony concerning a subsequent complaint of abuse by J.C. against defendant that was determined to be unfounded. Defendant argues this evidence was relevant and admissible. The admissibility of evidence is within the trial court's discretion, and its decision will not be disturbed absent an abuse of discretion. *People v. Ward* (1984), 101 Ill. 2d 443, 455-56.

■■ Defendant cites *People v. Gorney* (1985), 107 Ill. 2d 53, in support of its position. In *Gorney*, the defendant was charged with attempted rape and sought to introduce evidence concerning a prior false accusation of rape by the complainant. The court stated that "[e]vidence of prior false accusations of rape by the victim may be admissible, *** a trial judge might have considered the testimony relevant and probative." (*Gorney*, 107 Ill. 2d at 61.) The court concluded that, if the omission of such evidence was error, it was harmless given the other evidence presented establishing the defendant's guilt. *Gorney*, 107 Ill. 2d at 61.

We first note that the case at bar involves a *subsequent* allegation of sexual abuse, not a *prior* allegation. However, we are unaware of any reason why this fact should automatically render the subsequent allegation inadmissible. Another distinguishing feature in the case at bar is the proffered testimony concerning the subsequent allegation would not have absolutely proved the subsequent allegation false. In *Gorney*, the victim was an adult, and the proffered testimony clearly established she intended falsely to accuse someone of rape in an effort

to "get even" with that person. The facts are clear that in *Gorney* the proffered testimony involved an intentional lie.

In the case at bar, the proffered testimony concerning the subsequent allegation of abuse established a DCFS employee determined the allegation was unfounded. Additional proffered testimony on this issue would allegedly show J.C. was not in the presence of the defendant on the day in question. Therefore, it would have been impossible for the abuse to have occurred. Lastly, defendant also stated, if allowed to testify, J.C.'s step-grandmother would testify when J.C. did not get his way he would threaten to tell his mother, and she would call the police and have his step-grandmother put in jail. Defendant claims all of the above testimony is relevant and bears on J.C.'s credibility.

If a false accusation bears on a person's credibility, we can discern no reason why the timing should matter. A lie is a lie. While the character of allegation may distinguish this case from *Gorney*, unlike *Gorney*, this is an extremely close case. Defendant should have been allowed to attack J.C.'s credibility by use of the proffered evidence. We determine the trial court abused its discretion in refusing to admit testimony regarding the subsequent unfounded complaint of abuse. A new trial is warranted.

■ Defendant also claims that the court erred by refusing to admit evidence defendant argues tends to show Julie's husband, Doug, may have committed the acts of abuse. The proffered evidence involved testimony by J.C.'s grandmother establishing J.C. told her Doug did not take him to the hospital after J.C. fell at a bank and received a lump on his head. J.C. also told his grandmother that Doug would hit J.C. with a wooden spoon when J.C. refused to eat.

While it is true a defendant is entitled to present evidence that implies someone else may have committed the crime at bar (see *People v. Wilson* (1986), 149 Ill. App. 3d 293, 297), the above evidence is in no way relevant to the issues in the case at bar. The proffered testimony does not even remotely establish Doug may have sexually abused J.C. The court did not abuse its discretion by refusing to admit the above testimony.

■ Defendant next contends he was not proved guilty beyond a reasonable doubt. A criminal conviction will not be disturbed upon review unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of defendant's guilt. (*People v. Collins* (1985), 106 Ill. 2d 237, 261.) The test is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed.

2d 560, 573, 99 S. Ct. 2781, 2789.) While it is clear that it is the responsibility of the trier of fact to resolve factual disputes and assess the credibility of the witnesses (*People v. Yates* (1983), 98 Ill. 2d 502, 518), in cases involving sex offenses the reviewing court has a special duty to closely scrutinize the evidence. *People v. Allman* (1989), 180 Ill. App. 3d 396, 401.

■ Defendant argues that when a defendant convicted of aggravated criminal sexual abuse denies the charge, the conviction will be upheld only where the complainant's testimony is clear and convincing or corroborated by other evidence. (See *People v. Findlay* (1988), 177 Ill. App. 3d 903, 910-11.) The State argues this court should abandon the above requirements applied in sexual abuse cases. The State cites *People v. Roy* (1990), 201 Ill. App. 3d 166, 185, wherein the Appellate Court for the Fourth District stated:

"[T]here is no additional requirement that in a case in which a sex offense is charged the State must, in addition to proving the defendant guilty beyond a reasonable doubt, demonstrate either the evidence is substantially corroborated or the victim's testimony is clear and convincing. The testimony of no other category of crime victim is held to be automatically suspect or to require additional proof beyond the statutory requirements. The time has past [*sic*] to rid the law of this sexist anachronism."

This court has recently agreed with the court in *Roy*. (See *In re A.J.H.* (1991), 210 Ill. App. 3d 65, 70-71.) Therefore, we review defendant's conviction under the principles set forth in *Jackson* (443 U.S. at 319, 61 L. Ed. 2d at 573, 99 S. Ct. at 2789).

■ In the case at bar, J.C. testified defendant sucked J.C.'s "boobies" and penis. J.C. stated this occurred while he was watching television. J.C. testified the incident occurred on a Tuesday, began at 12:27 and concluded at 9:30. J.C. also testified his father, Edward, was sleeping at the time and did not witness the incident. A review of the record indicates J.C.'s testimony was, in some instances, nonresponsive, internally inconsistent and confusing. However, it must be noted J.C. is a five-year-old child testifying about incidents that occurred approximately one year prior to trial.

J.C.'s testimony was also somewhat impeached by other State's witnesses who testified as corroborative complaint witnesses. While Ms. Graham-Toohey testified J.C. told her that Edward did not witness the incident, Ms. Hughes and Ms. Gordon testified J.C. stated Edward did witness the incident and confronted defendant. Additionally, Ms. Gordon testified J.C. indicated the incident occurred at his grandmother's pool and specifically denied it took place in Edward's home as J.C.

had earlier testified. Furthermore, several witnesses contradicted details of J.C.'s complaint. However, these witnesses, along with several others, all testified J.C. made a complaint of sexual abuse. Additionally, Dr. Baptist testified to medical evidence he opined was indicative of sexual abuse occurring within the past four or five days. This time frame includes the time period alleged in the charging instrument.

This court cannot envision a case much closer than the case at bar. The case revolves around the credibility of the witnesses and particularly the complaining witness. Credibility is an issue for the trier of fact to resolve. (See *Yates*, 98 Ill. 2d at 518.) We cannot say that, when reviewing the evidence in the light most favorable to the State, no rational trier of fact could have found defendant guilty beyond a reasonable doubt.

Since a new trial is required, we address the restitution issue as it may reappear upon retrial. Defendant contends that the court erred by ordering him to pay $1,000 to the victim's mother for restitution. These monies were for attorney fees expended by the victim's mother in pursuing a petition to modify visitation rights. Defendant contends he should not be held responsible for the victim's mother's inability to work out amicably a visitation schedule with her ex-husband.

■■ Restitution is an appropriate sentence in some circumstances. (See Ill. Rev. Stat. 1987, ch. 38, par. 1005—5—6.) Section 5—5—6(b) of the Unified Code of Corrections provides in part:

"[T]he court shall assess the actual out-of-pocket expenses, losses, damages, and injuries suffered by the victim named in the charge and such other victims who may also have suffered out-of-pocket expenses, losses, damages, and injuries proximately caused by the same criminal conduct of the defendant ***." (Ill. Rev. Stat. 1987, ch. 38, par. 1005—5—6(b).)

Even though the victim's mother was not listed as a victim in the charges of which the defendant was convicted, the defendant may be required to make restitution if the losses sustained by the victim's mother were proximately caused by the same criminal conduct of the defendant as that of which he was convicted. (See *People v. Early* (1987), 158 Ill. App. 3d 232, 239.) However, restitution may not be ordered for matters unrelated to the charges before the court. *People v. Flanagan* (1985), 133 Ill. App. 3d 1, 5.

■■ We determine the attorney fees incurred by the victim's mother in an effort to modify the visitation rights of her ex-husband are unrelated to the charge of aggravated criminal sexual abuse against the defendant. Defendant's criminal conduct was not the proximate cause of the attorney fees incurred. The attorney fees were prox-

imately caused by the victim's mother's decision to pursue legal action in a separate proceeding. There were other alternatives available in this cause of action by which she could have sought the isolation of the defendant from the complainant, for example, a request for the imposition of a condition of the bond prior to trial and conditions placed on defendant's probation as ordered by the court. None of the above would have imposed a financial obligation on the mother.

In a negligence setting, if the defendant's negligence does nothing more than furnish a condition by which the injury is made possible, and that condition allows an injury to occur by the subsequent independent act of a third person, the creation of the condition is not the proximate cause of the injury. (*Illinois Central R.R. Co. v. Oswald* (1930), 338 Ill. 270, 273-74.) In the case at bar, there was a subsequent independent act of Julie moving the court to modify visitation in the divorce proceedings. Therefore, defendant's conduct was not the proximate cause of "damages" suffered by the victim's mother. It was error for the court to order the defendant to pay the attorney fees incurred by J.C.'s mother in attempting to modify visitation.

For the reasons stated above, we determine the court erred by refusing to admit evidence of a subsequent unfounded allegation of abuse. Defendant is entitled to a new trial based upon this defect. While this case is extremely close, we have not determined defendant was not proved guilty beyond a reasonable doubt. Therefore, double jeopardy does not preclude a new trial. The court's order of restitution for attorney fees incurred in modifying visitation was also in error.

The judgment of the circuit court of De Kalb County is affirmed in part and reversed in part, and the cause is remanded for proceedings consistent with this opinion.

Affirmed in part; reversed in part and remanded.

DUNN and GEIGER, JJ., concur.