Docket No. 95491–Agenda 17–September 2003.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. DONALD COOKSON, Appellant.

Opinion filed May 19, 2005.

JUSTICE KILBRIDE delivered the opinion of the court:

Defendant was charged with predatory criminal sexual assault (720 ILCS 5/12–14.1(a)(1) (West 1998)) and aggravated criminal sexual abuse (720 ILCS 5/12–16(c)(1)(i) (West 1998)) of A.C. (A.C. or complainant), then seven years old. Before trial, the State moved to introduce several hearsay statements given by A.C. relating to the alleged assaults. 725 ILCS 5/115–10 (West 1998). Following a hearing held pursuant to section 115–10 of the Code of Criminal Procedure of 1963 (Criminal Code), the court determined the time, content, and circumstances of the statements provided sufficient safeguards of reliability (725 ILCS 5/115–10(b)(1) (West 1998)) and admitted the statements. The court, however, refused to admit evidence A.C. had made allegations of sexual abuse against another person the Department of Children and Family Services (DCFS) determined on administrative appeal to be unfounded. Defendant was found guilty and sentenced to 25 years’ imprisonment. The appellate court affirmed. 335 Ill. App. 3d 786. We granted defendant’s petition for leave to appeal (177 Ill. 2d R. 315) and now affirm.

BACKGROUND

At the time of these events, defendant was married to the minor complainant’s mother, Judy Cookson. In fact, until a deoxyribonucleic acid (DNA) test was performed in 2000, defendant was believed to be the complainant’s father. The DNA test proved, however, another man, Rick Aston, was A.C.’s father. The complainant lived with defendant and Judy Cookson until she was seven years old, when Judy left defendant and moved to Hammond, Indiana, to live with Aston. While in Indiana, Judy worked as a prostitute, and Aston acted as her pimp. The three of them, Judy, Aston, and A.C., lived in cheap motels and on the street.

After several weeks, Aston and A.C. disappeared, prompting Judy to call defendant to Indiana to look for A.C. Later, Aston returned A.C. to Illinois and turned her over to the Springfield police. Based upon statements A.C. made after being returned to Springfield, defendant was charged with predatory criminal sexual assault and aggravated criminal sexual abuse.

Pursuant to section 115–10 of the Criminal Code, the State moved to introduce A.C.’s out-of-court statements concerning defendant’s alleged sexual assaults upon her. At a pretrial hearing, the proposed witnesses testified. Dorothy Rice, the DCFS on-call investigator who took A.C. into protective custody after A.C. was returned to Springfield, testified she took A.C. for a required health screening. After the examination, Rice drove A.C. to the emergency foster home. During the trip, Rice inquired about A.C.’s past based on a reference to prostitution and drugs made by the DCFS hotline operator who notified Rice to pick up A.C. at the police station.

According to Rice, A.C. initially stated she did not want to live with Judy and Donald because they fed her “nasty food like dogs or cats would eat.” A.C. also remarked she wished to live in a clean place. Rice further testified A.C. stated “her Daddy Donald Cookson give [
sic
] her marijuana, he run [
sic
] bath water in the tub, put her in the tub and he hump [
sic
] on her.” Rice indicated A.C. continued by saying “he takes his little thingy when [A.C.] is in the tub with him and he put it in her butt.” Initially, when asked if she had made any inquiries of A.C. concerning sexual abuse, Rice responded she had not. Later, when asked to provide the context of A.C.’s statements, Rice explained:

“[W]e got in the car and I was at the end of the entrance at Doctor’s Hospital when I asked [A.C.], ‘Have [
sic
] anyone ever done anything to you,’ and that’s when it came out. I hadn’t even turned out, you know, I was at the end of the entrance, and that’s when the conversation occurred.”

Rice also asked A.C. why her hair was cut so short. A.C. responded “she had sores in her head, and her father cut her hair off so they would heal fast.” Rice further testified A.C. identified her father as “Donald Cookson.”
(footnote: 1)
 Laverne Landers, A.C.’s foster parent, also testified at the section 115–10 hearing. She stated that she and A.C.’s caseworker picked A.C. up at the emergency foster home and drove her to Landers’ home. While A.C. was coloring at the kitchen table, Landers asked a general question concerning A.C.’s condition, and A.C. responded, “I am never going home. I am never going home. I’m not going back to Don and Judy.” She then briefly described in graphic street terms sexual abuse she alleged was committed by “Don” and “Judy.” According to Landers, A.C. continued, “They are going to jail, and I am going to stay here forever.”

Detective Richard Wiese of the Springfield police department testified at the section 115–10 hearing regarding the interview he and DCFS Investigator Timothy Gonzalez conducted with A.C. in a child-friendly room at the Child Advocacy Center. When the interview began, Wiese asked A.C. if she knew why she was there, and she stated because of something Don and Judy had done to her. According to Wiese, A.C. used slang terms such as ‘boobs,’ ‘dick,’ and ‘butt’ in describing the alleged abuse. He further stated that, while using an anatomically correct drawing as a reference, A.C. claimed defendant put his penis into her anus. A.C. described two incidents, one occurring in a bathroom and one in a bedroom, stating one of these incidents occurred in a gray house and the other in a pink house. Early in the interview, A.C. claimed these kinds of things happened all the time, but later she recanted and stated those were the only two times.

Investigator Gonzalez also testified at the hearing. According to Gonzalez, A.C. indicated she did not want to continue to live with Don and Judy because of what they had done to her. Gonzalez’s testimony regarding how A.C. described the alleged abuse was consistent with Wiese’s testimony. According to Gonzalez, A.C. stated she was six when the abuse occurred. Gonzalez further testified A.C.’s description of the events was remarkable for a child of her age.

In response to this testimony, defendant presented a report prepared by Dr. Victoria Nichols-Johnson, an obstetrician-gynecologist at Southern Illinois University. According to the report, A.C. told Dr. Nichols-Johnson that Judy had performed oral sex on A.C. and denied that defendant had anal sex with her. Rather, A.C. stated defendant would touch her groin area and had touched her vaginal area with his penis. A subsequent examination by Dr. Nichols-Johnson showed no evidence of scarring or trauma in any of these areas.

The trial court denied defendant’s motion 
in limine
 to bar the admission of the testimony concerning A.C.’s out-of-court statements. While noting both the discrepancy in A.C.’s statement to Dr. Nichols-Johnson and A.C.’s stated wish not to live with defendant or Judy, the court expressed doubt a child of A.C.’s age would be “clever” enough to fabricate a story of sexual assault to achieve a better home environment. The court further noted A.C.’s statements to Landers and Rice were spontaneous and her statements to Wiese and Gonzalez were obtained using professional interrogation techniques. According to the trial court, while A.C.’s use of terminology unexpected of a child her age could be explained by her exposure to street life, the court did not believe a child A.C.’s age would be capable of using those terms to make up a parental abuse accusation if some abuse had not actually occurred. Finally, the court determined that, overall, A.C.’s version of events was consistent.

The State filed its own pretrial motion 
in limine
 seeking to exclude evidence A.C. had made an allegation of sexual abuse against Aston that DCFS had determined on administrative appeal to be unfounded. In July 2000, six months after being placed into DCFS custody, A.C. alleged Aston stuck his finger into her vagina. Following an investigation, DCFS found the report to be “indicated.” Aston filed an administrative appeal, and the indicated finding was subsequently determined to be “unfounded.” Along with this administrative finding, defendant offered a sworn statement by Aston that the alleged abuse had not occurred and that A.C. had made up the abuse to get back at him. The trial court rejected this evidence. According to the trial court, the allegation was not proved false simply because the report was ultimately determined to be “unfounded.” As a result, the trial court refused to admit either the “unfounded” finding on appeal or Aston’s sworn statement.

At trial, Rice, Landers, Wiese, Gonzalez, and Dr. Nichols-Johnson reiterated their pretrial testimony. In addition, Wiese admitted he was not aware at the time of the interview that A.C. had recently spent several months in Aston’s care. Wiese also stated he had not investigated whether defendant had ever lived in a gray or pink house as A.C. claimed. Gonzalez noted A.C. continually referred to the perpetrator of the alleged assaults as “Don.” Dr. Nichols-Johnson testified A.C. reported she had been living in Indiana with her mother and a man named “Donald.” Based on their interpretation of A.C.’s statements, the doctors believed “Donald” was either her mother’s boyfriend or husband.

At the close of the State’s case, defendant made an offer of proof regarding the allegedly false sexual abuse allegation A.C. had levied against Aston. Defendant’s counsel stated that, if called to testify, Aston would acknowledge the allegation but deny any abuse. Defense counsel further indicated a DCFS worker would testify A.C. had accused Aston of sexual conduct. According to defendant, there were two independent bases for the admission of this evidence. First, defendant repeated his argument the evidence was relevant and admissible to show A.C. had previously made a false accusation of sexual abuse. Second, defendant contended the evidence was relevant to show A.C. had specifically accused Aston, in particular, of sexual abuse.

Following the close of evidence, defendant was convicted. His posttrial motion for a new trial was denied, and he was sentenced to 25 years’ imprisonment for predatory criminal sexual assault. He appealed, and the appellate court affirmed, concluding there were sufficient indicia of reliability to admit the hearsay statements to Rice, Landers, Gonzales, and Wiese under section 115–10(a). 335 Ill. App. 3d at 791-92. Both the trial court and the appellate court cited the factors used to determine the reliability of a child’s statement, including: (1) the spontaneity and consistency of the child’s repetition of the incident; (2) the child’s mental state; (3) the use of terminology not expected by a child of that age; and (4) the presence or absence of a motive to fabricate. 335 Ill. App. 3d at 791, citing 
People v. West
, 158 Ill. 2d 155, 164 (1994). The appellate court also rejected defendant’s contention that the trial court abused its discretion by refusing to admit evidence concerning the sexual abuse claim A.C. made against Aston. 335 Ill. App. 3d at 792-93.

Justice Cook disagreed with the majority on both issues. In his dissent, Justice Cook stated he would have found the hearsay statements inadmissible under section 115–10. He believed the statements to Wiese and Gonzales were particularly suspect because they were not spontaneous, but rather were the result of questioning, and they had not been videotaped despite the availability of video equipment. 335 Ill. App. 3d at 795-97 (Cook, J., dissenting). According to Justice Cook, the evidence demonstrated A.C. often confused defendant and Aston and had an independent motive to fabricate, namely, to escape her horrendous past environment. 335 Ill. App. 3d at 796 (Cook, J., dissenting). Justice Cook further believed the trial court erred in failing to admit evidence of A.C.’s allegation against Aston because there was sufficient proof of its falsity. 335 Ill. App. 3d at 797-98 (Cook, J., dissenting).

Defendant now appeals by leave of this court (177 Ill. 2d R. 315).

ANALYSIS

I. The Hearsay Statements

In this appeal, defendant challenges the admissibility of several witnesses’ testimony introduced at trial pursuant to the hearsay exception of section 115–10 of the Criminal Code. The relevant portions of section 115–10 provide:

“(a) In a prosecution for a physical or sexual act perpetrated upon or against a child under the age of 13 ***, the following evidence shall be admitted as an exception to the hearsay rule:

***

(2) testimony of an out of court statement made by the victim describing any complaint of such act or matter or detail pertaining to any act which is an element of an offense which is the subject of a prosecution for a sexual or physical act against that victim.

(b) Such testimony shall only be admitted if:

(1) The court finds in a hearing conducted outside the presence of the jury that the time, content, and circumstances of the statement provide sufficient safeguards of reliability; and

(2) The child ***

(A) 
testifies at the proceeding
[.] ***

* * *

(c) If a statement is admitted pursuant to this Section, the court shall instruct the jury that it is for the jury to determine the weight and credibility to be given the statement and that, in making the determination, it shall consider the age and maturity of the child, *** the nature of the statement, the circumstances under which the statement was made, and any other relevant factor.” (Emphasis added.) 725 ILCS 5/115–10 (West 1998).

In his supplemental brief, defendant contends the admission of A.C.’s testimony violated the rule announced in 
Crawford v. Washington
, 541 U.S. 36, 158 L. Ed. 2d 177, 124 S. Ct. 1354 (2004), concerning a defendant’s confrontation clause rights. We disagree. In 
Crawford
, the Court declared the confrontation clause “does not bar admission of a statement so long as the declarant is present in court to defend or explain it.” 
Crawford
, 541 U.S. at 59 n.9, 158 L. Ed. 2d at 197 n.9, 124 S. Ct. at 1369 n.9. Our statutory requirement that the child be available to testify at the proceeding (see 725 ILCS 5/115–10(b)(2)(A) (West 1998)) comports with this limitation. A.C.’s testimony does not run afoul of 
Crawford
.

In addressing the remainder of defendant’s hearsay arguments, we recognize trial courts possess discretion in determining the admissibility of evidence. 
People v. Zwart
, 151 Ill. 2d 37, 44 (1992). A reviewing court may overturn a trial court’s decision only when the record clearly demonstrates the court abused its discretion. 
Zwart
, 151 Ill. 2d at 44. Here, the State, as the proponent of the hearsay evidence, bore the burden of proving the “ ‘time, content, and circumstances’ ” of the complainant’s statements provided “ ‘sufficient safeguards of reliability’ ” for admission. 
Zwart
, 151 Ill. 2d at 43, quoting Ill. Rev. Stat. 1987, ch. 38, par. 115–10. Upon reviewing the record, we conclude the State sufficiently shouldered its burden of proof. While questions about the reliability of the statements may have arisen at trial, the record available at the time of the pretrial section 115–10 hearing supports the trial court’s decision to admit the complainant’s hearsay statements.

We first examine the language A.C. used to describe the incidents in her out-of-court statements. Standing alone, that language only equivocally supports the statements’ reliability. While the language reflects a knowledge of sexual activity unexpected and unusual for a typical six- or seven-year-old child, the complainant here had anything but a typical upbringing. The record shows for at least a portion of her young life A.C. was subjected to an appalling environment of prostitution and drug use. That environment itself was a likely source of the sexual terms she used to describe the alleged assaults. In admitting her statements, however, the trial court looked not only to the language A.C. used but also to the way she applied those terms to describe the assaults. The trial judge indicated he did not believe “most children of that age be able [
sic
] to hear that language and input it to create by fabrication an act perpetrated on them by their father. [The trial judge did not] know that the way she used terminology would be expected of a child of similar age, even under those circumstances, absent the probability that something, in fact, happened.” On this basis, the trial court’s determination that A.C.’s out-of-court statements were sufficiently reliable to be admitted was not an abuse of its discretion.

Defendant next argues the timing and circumstances surrounding the making of A.C.’s statements fail to provide sufficient safeguards of reliability for admission. Defendant points to several potentially troubling factors that arose during trial. For example, A.C. testified at trial that Aston had told her to say “bad things” about defendant, and the evidence established she had spent a significant amount of time in Aston’s custody. While by itself the substance of this testimony tends to support defendant’s contention that Aston had used his bond with A.C. to influence her to lie, A.C.’s honesty in admitting Aston’s attempt to influence her supports the opposite conclusion. At trial, A.C. readily admitted Aston had prompted her to speak ill of defendant, but she expressly denied Aston ever told her to make a false claim of sexual abuse by defendant. The trial judge had the advantage of observing the testifying witnesses and did not conclude A.C. was acting pursuant to Aston’s direction when she made the allegations against defendant. Under these circumstances, we cannot say the trial court abused its discretion by failing to exclude A.C.’s statements based on Aston’s possible influence over the child.

In addition, defendant claims A.C. exhibited her own independent motive to fabricate, demonstrated by her desire, expressed either immediately prior to, or contemporaneous with, each of her out-of-court statements, not to be returned to the custody of defendant and Judy, her biological mother. Among other things, A.C. complained defendant and Judy fed her “nasty food like dogs or cats would eat.” She also repeatedly stated her wish to live in a clean place and not with defendant and Judy. The trial court, in turn, found that, while A.C. did not wish to live with defendant again, there was “no evidence presented *** that she would be clever enough to fabricate [the accusations against defendant] in order to achieve that result.” The court then concluded A.C.’s preference to live elsewhere did not motivate her to make up abuse allegations against defendant.

Defendant suggests a potential weakness in this conclusion, namely, its failure to account for A.C.’s living arrangements during the six months preceding her statements. She had not actually been living with Judy and defendant immediately prior to making the statements, as her concerns would imply. For the previous six months, she had been staying with either Judy and Aston or just Aston. This potential discrepancy is compounded by other evidence suggesting A.C. may have used defendant’s name when she was actually referring to Aston.

For example, A.C. testified during trial cross-examination she sometimes “mixed up” defendant and Aston. She also agreed with defense counsel’s statement that “at one time or another [she has] called both of them her father.” In addition, Rice testified at the 115–10 hearing that A.C. said her father had cut her hair very short and, in the same conversation, identified her father as “Donald.” A.C. had not, however, been with Donald for at least six months before making the statements, having been with Aston during that time. Thus, it appears A.C. may have used defendant’s name (“Donald”) to refer to Aston when she related who had recently cut her hair.

Moreover, although Detective Wiese and DCFS Investigator Gonzalez testified to A.C.’s hearsay statements, they initially did not know she had spent the previous six months in Aston’s custody and sometimes mixed up the names of Aston and defendant. Based on the lack of this information, Wiese and Gonzalez could have misinterpreted A.C.’s references to her “father” and believed she was talking about defendant when, in fact, she was referring to Aston. Indeed, the dissent in the appellate court identified the possibility of identity confusion as “[t]he most troublesome aspect of this case.” 335 Ill. App. 3d at 796 (Cook, J., dissenting).

Our review of the record, however, reveals the majority of these “troubling aspect[s]” arose during trial. Therefore, the trial court could not have considered those factors when making its pretrial ruling on the admissibility of the hearsay statements. The trial court also did not have an opportunity to rectify this potential problem during trial. Defendant did not renew his objections to the hearsay testimony when it was presented at trial. At the close of the State’s case, defendant made his offer of proof concerning the admission of A.C.’s sexual abuse allegation against Aston, contending “[g]iven the confusion that has been exhibited with regard to the statements [A.C.] has made to others in the past in the 115–10 statements, the jury should be allowed to consider that in connection with whether Rick Aston is, in fact, the one who sexually assaulted her as alleged in the Indictment or Indictments.” Defendant did not, however, apply this contention to argue A.C.’s hearsay statements were inadmissible. Furthermore, defendant never formally requested at trial that the court revisit its pretrial ruling on the admission of the hearsay statements. Based on the record as it existed during the trial and the pretrial hearing on A.C.’s hearsay statements, we conclude the trial court did not abuse its discretion in admitting those statements.

Defendant’s posttrial motion for a new trial focused almost entirely on the trial court’s refusal to admit the evidence relating to A.C.’s abuse allegation against Aston. The motion contained a single contention regarding the hearsay statements, claiming “[t]he Court erred in allowing the State to present hearsay evidence at trial, ostensibly pursuant to Section 115–10 of the Criminal Code of Procedure [citation], in that said evidence was unreliable and cumulative.” During oral argument on the motion, defense counsel acknowledged the allegation against Aston was the “main issue.” Counsel referenced the hearsay ruling only indirectly, by noting “other grounds *** were all argued,” with “authority presented on both sides of those arguments or most of those points, anyway, at the time of trial.” He then declined to “speak to those, unless the Court ha[d] any questions.”

Even after reviewing the admission of the hearsay statements in light of all the evidence presented at trial, we cannot say the trial court abused its discretion. See 
Zwart
, 151 Ill. 2d at 44 (requiring a clear showing the trial court abused its discretion to overturn a ruling on the admissibility of evidence). While A.C. admitted on cross-examination she sometimes “mixed up” Aston and defendant, her answers to the immediately following questions indicated this confusion was primarily directed at the identity of the man she considered her “father” or “dad.” The relevant portion of A.C.’s testimony on cross-examination follows:

“Q. Okay, let me ask you, [A.C.], do you get Rick and Don mixed up sometimes?

A. Yes.

Q. All right, and at one time or another you have called both of them your father, right, or your dad?

A. Yes.

Q. Okay, and who is your dad? Who [
sic
] do you think of as your dad today, if anybody?

A. Rick.

Q. Rick, okay. You think of Rick as your dad?

A. Yes.

Q. All right. And since you went to live with the Landers, you know now, or you have been told anyway, that Don is not your dad, right?

A. He is.

Q. He is your dad?

A. Yes.

Q. He is your dad?

A. Yes.

Q. Okay, because he raised you, didn’t he?

A. Yeah.

Q. I mean from when you were little, right?

A. Yes.

Q. You lived with him from back when you were just a baby growing up until you moved out with your mother and starting living with Rick; isn’t that right?

A. Yes.”

This series of questions indicates defendant was attempting to establish that A.C. sometimes called both men her “dad,” thus creating confusion about who she was referring to in her hearsay statements. Defendant also attempted to elicit testimony from Wiese and Gonzalez that A.C. told them during her interview she had been abused by her “father” or “dad,” but both witnesses testified she consistently called her abuser “Don” or referred to him as “he.” At no point did she mistakenly say Aston or “Rick” had committed the abuse alleged in this case. Rice also testified that “the majority of the time [A.C.] would say Donald” rather than “Daddy” or “Father” when describing the incidents. A.C.’s repeated use of the name “Don” rather than “dad” to identify her abuser does not support defendant’s contention that her hearsay statements were too unreliable to be admitted because she may have also expressed some understandable confusion about the identity of father.

Finally, A.C.’s testimony at trial did not vacillate concerning the identity of her abuser. Indeed, A.C. indicated Aston and defendant did not look alike, stating Aston was tall and defendant was short. She also pointed to defendant when asked to identify the person who had committed the abuse she had just described at trial and indicated the color of his clothing and his position in the courtroom. While defendant could, and in fact did, argue to the jury that A.C. had mistakenly identified defendant as the perpetrator, we cannot say the hearsay statements were so unreliable as to demonstrate clearly that the trial court abused its discretion in admitting them. See 
Zwart
, 151 Ill. 2d at 44 (requiring a clear showing the trial court abused its discretion to overturn a ruling on the admissibility of evidence). The jury was able to consider properly defendant’s mistaken identity contentions in their evaluation of the weight to be given to both those statements and A.C.’s testimony itself.

On a related subject, we take this opportunity to address the troubling absence of a videotape of A.C.’s interview by Detective Wiese and DCFS Investigator Gonzalez, despite the availability of video equipment. This court has previously recognized the value of taping an interview of a child sex offense complainant. As we reasoned,

“The probative value of corroborating complaints in these cases, especially in videotaped form, has been widely recognized. Children may be subject to memory loss in the often prolonged period between the abuse and trial, and videotaping the child’s account of abuse at the earliest opportunity preserves the account while it is still fresh in the child’s memory; in addition, it allows for the examination of the conditions prevalent at the time of the child’s initial complaint. [Citation.] A recording close in time to the first outcry, prior to any charges being filed, where feasible, also makes the statement less likely to be the product of suggestion or even manipulation by overzealous prosecutors, parents or caseworkers.” 
People v. Bowen
, 183 Ill. 2d 103, 115-16 (1998).

Indeed, on at least one occasion our appellate court has stated the failure to record a child’s statement when recording equipment is available may be considered a negative factor in determining the statement’s reliability. 
People v. Simpkins
, 297 Ill. App. 3d 668, 677-78 (1998). While we believe the lack of a contemporaneous video recording does not render the interview unreliable (see 
People v. Wittenmyer
, 151 Ill. 2d 175, 187 (1992)), we once again strongly admonish law enforcement personnel and social workers to record those interviews whenever possible.

II. Abuse Allegations Against a Third Party

Next, we address the issue of whether the trial court properly excluded evidence of a sexual abuse allegation A.C. made against Aston. At trial, the State filed a motion
 in limine
 seeking to bar: (1) the admission of A.C.’s subsequent allegation against Aston; (2) the administrative reversal of DCFS’s “indicated” finding of abuse by Aston; and (3) Aston’s denial and alternative explanation of A.C.’s accusation. The State based its motion on two grounds: (1) the material could not properly be used to impeach A.C.’s credibility because the accusations were not “demonstrably false” and (2) the accusation against Aston was not relevant to the charges facing defendant and would only tend to confuse the jury. In response to the State’s motion, defendant argued, 
inter alia
, the evidence was admissible to impeach A.C.’s credibility because the accusations were demonstrably false based on both the administrative reversal of the indicated finding and Aston’s denial.

The trial court rejected defendant’s arguments, finding first “under this factual scenario, an appellate reversal of a finding of indicated does not rise to the legal standard of demonstrably false” because mere disagreement on appeal with DCFS’s application of the credible evidence standard is “not the affirmative type of finding *** necessary for a finding of demonstrably false.” The court next concluded A.C.’s allegation against Aston was not sufficiently similar to the type of abuse she alleged against defendant to be relevant. During defendant’s offer of proof at the close of the State’s case, defense counsel added the argument that the evidence was admissible because it related to A.C.’s alleged “confusion” of defendant and Aston. Defendant did not, however, formally request the trial court to reconsider its prior ruling on the State’s pretrial motion
 in limine
.

Before this court, despite defendant’s prior adoption of a “demonstrably false” standard for determining the admissibility of A.C.’s accusation against Aston, he now advocates the application of a preponderance of the evidence standard. Indeed, the only argument defendant now raises on this issue is that the evidence should have been admitted to impeach A.C.’s credibility because a preponderance of the evidence establishes her accusation against Aston was false. The State, in turn, contends the proffered evidence was properly excluded because a witness may not be impeached with specific collateral instances of untruthfulness. The State also adheres to the demonstrably false standard and maintains defendant’s proof did not rise to that level.

This issue does not invoke hearsay concerns because A.C.’s out-of-court statements were not offered for the truth of the matter asserted. See 
People v. Heard
, 187 Ill. 2d 36, 65 (1999). Indeed, the only argument on appeal concerns the admissibility of the evidence to impeach A.C.’s credibility. Since hearsay is not at issue, we address only the parties’ arguments on the impeachment issue. On questions of the admissibility of evidence, we will not substitute our judgment for that of the trial court unless the record clearly shows the trial court abused its discretion. 
People v. Ward
, 101 Ill. 2d 443, 455-56 (1984). We find no clear abuse of discretion in this case.

We have consistently held the proper procedure for impeaching a witness’ reputation for truthfulness is through the use of reputation evidence and not through opinion evidence or evidence of specific past instances of untruthfulness. 
People v. Kliner
, 185 Ill. 2d 81, 173 (1998); 
People v. West
, 158 Ill. 2d 155, 162 (1994)
 (rejecting the argument evidence of specific acts of untruthfulness should be admitted to impeach a child witness because the child was too young to have developed a reputation in the community)
. This rule applies with equal force to all witnesses, regardless of age. 
People v. Williams
, 139 Ill. 2d 1, 21 (1990). This case has not presented us with any compelling basis for altering this rule in cases involving sexual abuse allegations, and we take this opportunity to reaffirm that principle.

As we have previously recognized, however, some jurisdictions provide an exception to this rule, permitting defendants accused of sexual assault to introduce evidence their accuser has previously made false accusations of sexual assault. See 
People v. Sandoval
, 135 Ill. 2d 159, 185 (1990), quoting 
People v. Hackett
, 421 Mich. 338, 348, 365 N.W.2d 120, 124-25 (1984) (“the defendant should be permitted to show that the complainant has made false accusations of rape in the past”); 
Sandoval
, 135 Ill. 2d at 187 (citing 
Smith v. State
, 259 Ga. 135, 377 S.E.2d 158 (1989), and 
Stewart v. State
, 531 N.E.2d 1146 (Ind. 1988)). Although this court has suggested that type of evidence may be admissible, it has not addressed the requisite conditions for its admission. See 
People v. Gorney
, 107 Ill. 2d 53, 60-61 (1985) (“in the absence of the compelling evidence here it well might have been error to reject the proposed testimony. Evidence of prior false accusations of rape by the victim may be admissible, and though here no false charge actually was brought, a trial judge might have considered the testimony relevant and probative”). This case presents us with an opportunity to examine the rationale and parameters for admitting evidence relating to other allegations of sexual assault as a means of impeaching a complainant’s general credibility rather than as a specific attack on the complainant’s reputation for truthfulness.

We have long applied the rule that a witness may be impeached by a showing of bias, interest, or motive to testify falsely. 
People v. Bull
, 185 Ill. 2d 179, 206 (1998). In 
Bull
, the defendant sought to admit the disciplinary record of the prosecution’s expert witness, arguing it gave him a “motive to testify falsely or to embellish his testimony to please his employers.” 
Bull
, 185 Ill. 2d at 206. After acknowledging that “evidence of arrests or other charges” is generally not admissible to impeach a witness’ credibility, this court explained that evidence may nonetheless be admitted to show the witness’ interest, bias, or motive to lie. 
Bull
, 185 Ill. 2d at 206. We cautioned that the evidence “must give rise to the inference that the witness has something to gain or lose by his or her testimony. Therefore, the evidence used must not be remote or uncertain.” 
Bull
, 185 Ill. 2d at 206, citing 
People v. Triplett
, 108 Ill. 2d 463, 475-76 (1985).

Similarly, in 
People v. Howard
, 113 Ill. App. 3d 380, 385 (1983), our appellate court applied the same rationale when a defendant accused of sexual abuse by his teenage stepdaughter sought to admit evidence she had previously made sexual abuse allegations against him. The court noted criminal defendants should be given wide latitude to establish bias, prejudice, or a motive to testify falsely. 
Howard
, 113 Ill. App. 3d at 385, citing 
People v. Barr
, 51 Ill. 2d 50, 51-52 (1972). This wide latitude, the court explained, “is particularly important where *** the State’s case rests almost entirely on the credibility of its witnesses.” 
Howard
, 113 Ill. App. 3d at 385.

Here, as in many if not most child sexual abuse cases, there was no testimony from third-party eyewitnesses. There was also no physical evidence linking defendant to the alleged abuse. In addition, defendant’s objection to the State’s motion 
in limine
 seeking to exclude evidence relating to A.C.’s accusation against Aston was based, in part, on needing the evidence to impeach A.C.’s credibility because the allegation was determined to be “unfounded” on administrative appeal. Under these circumstances, A.C.’s credibility was undeniably at issue in the case. Defendant was entitled to present evidence of A.C.’s potential interest, bias, and motive to lie to impeach her credibility. See 
Bull
, 185 Ill. 2d at 206.

Defendant’s proposed impeachment evidence consisted of: (1) a DCFS worker’s testimony that A.C. alleged she was sexually abused by Aston; (2) the reversal on administrative review of DCFS’s original finding that the claimed abuse was “indicated”; and (3) Aston’s proposed testimony that he did not abuse A.C. and that he believed she made up the allegation because she was upset with him. We must determine whether any of this evidence supports the inference A.C. possessed an improper interest, bias, or motive to lie. We note that to be admissible, “the evidence used must not be remote or uncertain.” See 
Bull
, 185 Ill. 2d at 206.

First, we conclude evidence relating to abuse allegedly committed by 
Aston
 does not establish A.C.’s bias against 
this defendant
. The two men were not linked in any way to create the rational inference that the irritation Aston claimed motivated her “false” allegation against him would carry over to defendant, particularly since the accusation at issue here was made six months before A.C. reported being abused by Aston. The speculative nature of this evidence makes it inadmissible to show A.C.’s bias against defendant. See 
Bull
, 185 Ill. 2d at 206.

Next, we do not believe the evidence properly shows A.C. has an improper interest in this matter or a motive to lie about being abused by this defendant. Neither the fact A.C. reported abuse by Aston nor Aston’s self-serving denial of those accusations establishes any improper interest or permissible motive for A.C. to lie about defendant as well. Indeed, the trial court specifically rejected the suggestion a young child such as A.C. could have fabricated the accusations against defendant to obtain a better home, and, without the advantage of observing the witnesses, we defer to its conclusion regarding A.C.’s maturity and strategic abilities. Thus, the only relevant inference a jury could draw from the evidence of the abuse allegation against Aston and his explanatory denial would be that A.C. lied about being abused by defendant, but this court has already specifically rejected the use of evidence of specific past instances of untruthfulness to impeach a witness’ truthfulness. See 
Kliner
, 185 Ill. 2d at 173; 
West
, 158 Ill. 2d at 162.

Finally, we note the parties make much of the admissibility of evidence showing the original DCFS finding of “indicated” was reversed on administrative appeal. Their arguments focus primarily on the appellate decisions in 
People v. Nicholl
, 210 Ill. App. 3d 1001 (1991), and 
People v. Mason
, 219 Ill. App. 3d 76 (1991). Defendant urges us to adopt the reasoning in 
Nicholl
 and reject 
Mason
. The State counters that 
Mason 
accurately reflects the law of impeachment in Illinois and 
Nicholl
 is distinguishable. We believe the results in both cases are consistent with our rationale in the instant appeal.

In 
People v. Nicholl
, 210 Ill. App. 3d 1001 (1991), the defendant was convicted of aggravated criminal sexual abuse, and he appealed, arguing, in relevant part, the trial court erred by refusing to admit evidence of the victim’s subsequent false accusation against him. As in this case, the proffered evidence involved a DCFS worker’s conclusion the allegation was unfounded. 
Nicholl
, 210 Ill. App. 3d at 1010. The appellate court held the trial court should have admitted the evidence, including testimony from the alleged victim’s father stating the child was not in the defendant’s presence on the day in question, making it impossible for the uncharged abuse to have occurred. 
Nicholl
, 210 Ill. App. 3d at 1010-11. There was also evidence the child’s mother had repeatedly threatened to “get” defendant and the child had “no independent recollection” of the subsequent incident of alleged abuse. 
Nicholl
, 210 Ill. App. 3d at 1008-09. Taken together, this evidence suggests the five-year-old victim may have, 
albeit
 unwittingly, had some bias or motive not to tell the truth about the charged incident due to his custodial mother’s hostile influence.

In 
Mason
, the defendant was convicted of a sex offense against a seven-year-old child. The defendant appealed, arguing, 
inter alia
, the court erred by barring evidence of a prior sexual assault accusation made by the alleged victim that had been determined to be unfounded. That allegation had been made against the defendant two years earlier. The 
Mason
 court held evidence concerning the “unfounded” status of the accusation was properly excluded. That evidence included the defendant’s admission, made during the investigation of the child’s previous allegation, that he actually had improperly touched the child. 
Mason
, 219 Ill. App. 3d at 82. Thus pursuant to our reasoning in the instant case, the proffered evidence would have had no bearing on the child’s interest, bias, or motive to be untruthful regarding the later, charged, allegation of abuse.

Here, the situation is more similar to that in 
Mason
 because even if evidence of the reversal of the indicated finding is admitted, it fails to establish A.C. had any interest, bias, or motive to lie about 
this
 defendant. Accordingly, in the absence of a demonstration of A.C.’s improper interest, bias against defendant, or motive to fabricate abuse claims against him, evidence relating to A.C.’s sexual abuse accusation against Aston was properly excluded by the trial court.

III. CONCLUSION

For these reasons, we hold that, given the totality of the circumstances, the trial court did not abuse its discretion by admitting the hearsay statements of A.C. concerning the alleged sexual assault by defendant in this case. We further hold the trial court did not err by refusing to admit evidence concerning the allegation of sexual abuse A.C. made against a third party, Rick Aston. The appellate court judgment, affirming the defendant’s conviction, is affirmed.

Appellate court judgment affirmed
.

JUSTICE KARMEIER took no part in the consideration or decision of this case.

FOOTNOTES
1:     
1
At trial, Rice testified A.C. told her “Donald cut [her hair] so [the sores] would go away faster.”