# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *In re Brandon P.*, 2013 IL App (4th) 111022

---

| | |
|---|---|
| Appellate Court Caption | In re: BRANDON P., a Minor, THE PEOPLE OF THE STATE OF ILLINOIS, Petitioner-Appellee, v. BRANDON P., Respondent-Appellant. |
| District & No. | Fourth District<br>Docket No. 4-11-1022 |
| Filed<br>Rehearing denied | August 5, 2013<br>August 19, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Respondent's sentence to the Department of Juvenile Justice for an indeterminate term following a finding that he was guilty of aggravated criminal sexual abuse against his three-year-old cousin was upheld over his contentions that the trial court erred in admitting the victim's hearsay statements to a police officer, that his counsel was ineffective in failing to object to the admission of DNA evidence, and that he was deprived of a fair trial. |
| Decision Under Review | Appeal from the Circuit Court of Vermilion County, No. 10-JD-238; the Hon. Craig H. DeArmond, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Michael J. Pelletier, Karen Munoz, and Catherine K. Hart (argued), all of State Appellate Defender's Office, of Springfield, for appellant. |
| | |
| | Randall Brinegar, State's Attorney, of Danville (Patrick Delfino, Robert J. Biderman, and David E. Mannchen (argued), all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| | |
| Panel | PRESIDING JUSTICE STEIGMANN delivered the judgment of the court, with opinion. |
| | Justices Appleton and Holder White concurred in the judgment and opinion. |

**OPINION**

¶ 1    In November 2010, the State charged respondent, Brandon P. (born December 5, 1995), by petition for adjudication of wardship with aggravated criminal sexual abuse (720 ILCS 5/12-16(c)(2)(i) (West 2010) ("the accused was under 17 years of age and *** commits an act of sexual conduct with a victim who was under 9 years of age when the act was committed")). The State alleged that respondent committed "an act of sexual conduct" against M.J. (born July 30, 2007).

¶ 2    Following an August 2011 adjudicatory hearing, the trial court found respondent guilty of aggravated criminal sexual abuse. Shortly thereafter, the court sentenced respondent to the Illinois Department of Juvenile Justice for an indeterminate period not to exceed (1) the period for which an adult could be committed for the same act or (2) the date of respondent's twenty-first birthday (705 ILCS 405/5-750 (West 2010)), whichever came sooner.

¶ 3    Respondent appeals, arguing that (1) the trial court erred by (a) admitting M.J.'s hearsay statements to police under section 115-10 of the Illinois Code of Criminal Procedure of 1963 (Criminal Procedure Code) (725 ILCS 5/115-10 (West 2010)) because they were "unreliable" and (b) finding that statements M.J. made to police were not "testimonial," resulting in a violation of his right to confront M.J.; (2) he was provided ineffective assistance of counsel, given that counsel failed to object to the admissibility of certain scientific evidence; and (3) he was deprived of a fair trial because the State's evidence consisted of "unconstitutional hearsay testimony and inconclusive yet prejudicial scientific evidence." We disagree and affirm.

¶ 4                    I. BACKGROUND
¶ 5            A. The State's Charge and Pretrial Motions
¶ 6    In November 2010, the State charged respondent by petition for adjudication of wardship with aggravated criminal sexual abuse (720 ILCS 5/12-16(c)(2)(i) (West 2010) ("the accused

was under 17 years of age and *** commits an act of sexual conduct with a victim who was under 9 years of age when the act was committed")). The State alleged that 14-year-old respondent committed an act of sexual conduct against his 3-year-old cousin, M.J.

¶ 7 In December 2010, the State filed a notice of intent to present evidence under section 115-10 of the Criminal Procedure Code (725 ILCS 5/115-10 (West 2010)). Specifically, the State sought to offer statements that M.J. initially made to her mother and later to the police that respondent "put his finger in her vagina which made her feel bad and *** spit on her vagina and put his penis on her at Uncle Mike's."

¶ 8 In January 2011, the State filed a motion, seeking a hearing on consumption of samples of deoxyribonucleic acid (DNA) evidence taken from a sexual assault kit performed on M.J. That kit contained vaginal, anal, and underwear swabs. As part of its motion, the State also requested a buccal swab from respondent. The trial court later granted that motion.

¶ 9 B. The Hearing on the State's Motion To Present Statements
Under Section 115-10 of the Criminal Procedure Code

¶ 10 In May 2011–while the trial court was waiting for the DNA results from the State's laboratory–the court conducted a hearing to determine whether to admit the section 115-10 statements the State sought to present. M.J.'s mother, Theresa J., and also Officer Troy Hogren, who investigated M.J.'s allegations against respondent, testified regarding the statements M.J. made to each of them, respectively.

¶ 11 Theresa testified that she had five children: Stephanie (19 years old); Kayla (19 years old); Lucas (7 years old); Alana (5 years old); and M.J. (3 years old). Theresa also noted that respondent was her nephew.

¶ 12 Theresa explained that on October 23, 2010, she picked respondent up from the police station, and respondent spent the night at her house with her and the children. (Respondent was at the police station for an unrelated matter.) Respondent had been having problems with his parents. (Respondent's father, Mike, was a truck driver and away from home at the time.)

¶ 13 The next morning, Theresa left the house for approximately two hours. When Theresa returned, she was in the dining room with Kayla, Stephanie, and Kayla's boyfriend, Jeff. The rest of the children were upstairs. Theresa heard a scream, and Jeff went upstairs to "check on the kids." Lucas, Alana, M.J., and respondent were all in Lucas's room with the door shut.

¶ 14 Shortly thereafter, Theresa left to pick up Mike from the "truck yard." All the children remained at the house. Theresa and Mike arrived back at the house, and not much later, Mike and respondent left to return home. The prosecutor inquired into what happened at that point, as follows:

"[PROSECUTOR]: And what happened after [respondent] left?

[THERESA]: Uhm, I can't remember approximately how long it was after [respondent] left, but [M.J.] had come downstairs; and she was *** holding herself.

[PROSECUTOR]: What do you mean by holding herself?

[THERESA]: She had her hand on her *** pee-pee as she would say, and she had–I thought she had to go to the bathroom. And I asked her if she had to go, and she said yes

-3-

but it hurt. And I told her to go ahead and–I believe I told her to go ahead and go. Then I asked her why it hurt, and she said because [respondent] had put spit in her pee-pee.

[PROSECUTOR]: And after she said *** that, did you ask any further questions?

[THERESA]: I, uhm, I asked her to–I took her to my brother's house."

¶ 15 When Theresa and M.J. arrived at Mike's house, Theresa asked M.J. to tell respondent's parents what she told her, as follows: "Can you tell Uncle Mikey and Aunt Aundrea what you told me?" M.J. thereafter told respondent's parents that respondent "put spit on her pee-pee." Theresa then called the police, who instructed Theresa to take M.J. to the hospital immediately. The police later met Theresa at the hospital.

¶ 16 On cross-examination, defense counsel sought to clarify what, precisely, M.J. said to Theresa:

"[DEFENSE]: So when you were questioning or talking to [M.J.], *** she stated to you that her pee-pee hurt; is that correct?

[THERESA]: Yes.

[DEFENSE]: And then what exactly did you say after that?

[THERESA]: Her pee-pee hurt, that's why she couldn't go pee. I asked her why, and she said that [respondent] had spit on her pee-pee.

[DEFENSE]: And she *** used the actual word spit?

[THERESA]: She went like–said, 'He did this and put it on my pee-pee.'

THE COURT: The record should reflect that the witness inserted her right index finger into her mouth indicating that motion by the child.

* * *

[DEFENSE]: When she said that *** [respondent] put the saliva with that motion, did she give any indication of what he did with it?

[THERESA]: She said that–she just touched her pee-pee and said it hurt and that's what he had done.

[DEFENSE]: She didn't give any indication if it was below the clothes or under the clothes?

[THERESA]: I *** can't remember if it was at that time or if it was when we were at the hospital."

¶ 17 Hogren testified that he began investigating M.J.'s case "a couple of days after the report was generated by [the] patrol officer." Hogren interviewed M.J. at a "Public Safety Building" while Theresa was present. On direct examination, the prosecutor asked Hogren how he initiated the discussion about the allegations, given M.J.'s tender age:

"[PROSECUTOR]: And how did you initiate your conversation with [M.J.]?

[HOGREN]: She sat–she was very shy. She obviously didn't know me. I introduced myself to her, explained to her that I was a police officer and I work with kids and I was here–she wasn't in any trouble and I was here to talk to her about something that may have happened to her. And she sat on my lap and I asked her, you know, what her name was. She was able to tell me her full name, her middle name and her last name. And I

asked her how old she was. She said she was three. I asked her who she lived with. She said that she lived with her mommy and her sisters. And I asked her if she had any brothers and she said she had a brother named Lucas and I believe he was six and another sister named Alana that was five or six, around there. Said she didn't go to school, you know, she didn't attend any schools. She wasn't able to tell me what town she lived in or–or what street she lived on, but she appeared–other than being very shy she appeared to function normally I thought for her age.

[PROSECUTOR]: And she understood the questions that you were asking?

[HOGREN]: Yes.

\* \* \*

[PROSECUTOR]: And how did you bring up with her the pending investigation at that point?

[HOGREN]: Well, I explained to her that I wanted to talk to her about what she had told her mother a couple days ago and that I was here to talk to her about something that may have happened to her that she didn't like, and she told me that she was at home there in Lucas's bedroom and it was her and Lucas and Alana and [respondent] and they were playing police and cops, some sort of a police and cops game, and she couldn't tell me what [respondent's] last name was[,] she just told me that [respondent] was Uncle Mike's son. \*\*\* And [M.J.] explained that they were playing this game and that [respondent] stuck his finger in her pee pee.

[PROSECUTOR]: She said that he stuck his finger in her pee pee?

[HOGREN]: Yes.

[PROSECUTOR]: Did \*\* \*you ask her what her pee pee was or–

[HOGREN]: Well, when she said that she pointed, she made a motion with her finger in between her legs.

[PROSECUTOR]: And pointed in between her legs?

[HOGREN]: Yes, in the front.

[PROSECUTOR]: And after she made that statement did you inquire more of her from that [(*sic*)]?

[HOGREN]: I asked her if she \*\*\* had her clothes on or off. She said her clothes were on. I asked her if she had told anybody what had happened to her and she said she told Aundrea and Uncle Mike \*\*\* what happened to her. She said she told them that [respondent] spit in her pee pee and that [respondent] put his wiener on her at Uncle Mike's house.

[PROSECUTOR]: And she said that happened at Uncle Mike's house?

[HOGREN]: Well, she said that [respondent] put his wiener on her at Uncle Mike's house.

[PROSECUTOR]: And did you inquire more of those statements?

[HOGREN]: I asked her if \*\*\* that was on top of her clothes or on her skin and she said her clothes were on."

Hogren added that his entire conversation with M.J. lasted between 20 and 25 minutes.

¶ 18    Following the presentation of evidence and argument at the section 115-10 hearing, the trial court found that the State could introduce at trial the statements M.J. made to Theresa and later to Hogren, outlining its rationale as follows:

"Well, we need to take into consideration, first of all, this is a three[-]year[-]old child at the time. Secondly, disclosure was not even intended as a disclosure which gives it even greater reliability. The child comes downstairs holding herself. The mother asked if she needs to go to the bathroom. She's not asking anything about any suspicious behavior, simply do you need to go to the bathroom. The child says yes but it hurts. The mother simply asked why does it hurt and the child then discloses. There's nothing leading about it. There's nothing suggestive about it. The child simply indicates the reason why her private hurts which is an indication that [respondent] has done something with her vagina. There's no time to fabricate. The age of the child is relevant. There's no motive. There's no indication of any issues between the child, the child's mother and the minor or those members of the family.

Taking into consideration all of those factors, the time, content, and circumstances do provide sufficient reliability to the statements as to allow them to be admissible under [section] 115-10.

Then we go to *** Hogren. Contrary to arguments of counsel[,] there were no leading questions. The questions were very open-ended. The questions *** did not have to do with the investigator suggesting the perpetrator to the child. That wasn't the testimony at all. Yes, [respondent's] name came up earlier in the conversation but it had nothing to do with identifying him as the perpetrator of what happened. She is the one who identified who the person was. The officer's questions were nonspecific, very open-ended.

Taking into consideration the age of the child, she answered the questions as best she could. Adding greater reliability is the fact that in her statements to the officer she even acknowledged the second statements made to the aunt and uncle and she wasn't even being asked about that. She was being asked about whatever she had told her mother which would also add to its reliability.

So taking into consideration all of those factors, I find that there is a sufficient basis for reliability of the statements to allow them to be admitted."

Notwithstanding the court's findings as to M.J.'s statements to Theresa and Hogren, the court found that the State should not be permitted to use M.J.'s statements to respondent's parents at respondent's house at trial because the State did not specifically seek to use those statements.

¶ 19                    C. Respondent's August 2011 Bench Trial

¶ 20    At respondent's August 2011 bench trial, the State presented evidence in support of its allegation that respondent committed aggravated criminal sexual abuse against M.J. through testimony, physical evidence, and M.J.'s 115-10 statements. The State called Theresa to

testify first.

¶ 21    Theresa testified consistently with her testimony from the May 2011 section 115-10 hearing. Namely, among other things, Theresa recalled that shortly after Mike took respondent home, M.J. came downstairs complaining that her "pee-pee" hurt and that respondent had spit on her "pee-pee."

¶ 22    The trial court recessed and thereafter reconvened in the jury room with the prosecutor, Theresa, respondent, Mike, as well as defense counsel, for M.J.'s testimony. M.J. testified as follows:

> "THE COURT: *** Can you tell me how old you are?
>
> [M.J.]: Four.
>
> THE COURT: Four. Did you just turn four?
>
> [M.J.]: (Witness nodding head up and down)
>
> THE COURT: Do you know what your birth date is?
>
> [M.J.]: (Witness shaking head back and forth)
>
> THE COURT: No? Did you have a birthday party?
>
> [M.J.]: (Witness nodding head up and down)
>
> THE COURT: Was it a good party?
>
> [M.J.]: (Witness nodding head up and down)
>
> THE COURT: Okay. Do you know where we are? Do you know what this building is called?
>
> [M.J.]: (Witness shaking head back and forth)
>
> THE COURT: No? Okay. Do you know what we're doing here?
>
> [M.J.]: (Witness shaking her head back and forth)
>
> THE COURT: Not really? Will you answer some questions for us if we ask you some questions?
>
> [M.J.]: (Witness nodding head up and down)
>
> [THERESA]: Can you say 'yes'?
>
> THE COURT: Can you say 'yes' for me?
>
> [M.J.]: 'Yes.'
>
> THE COURT: Yes or no, whichever your answer is. This lady takes everything down; everything we say she types on a little machine, okay? So we have to make sure that we talk out loud. Okay?
>
> [M.J.]: (Witness nodding head up and down)
>
> THE COURT: If we ask you questions, will you tell us the truth?
>
> [M.J.]: (Witness nodding head up and down)
>
> THE COURT: Is that a 'yes'?
>
> [M.J.]: (Witness nodding head up and down)
>
> THE COURT: Could you answer out loud.

[M.J.]: 'Yes.'

THE COURT: If you don't understand a question, if you don't understand something I'm saying or that somebody is saying, will you let us know that?

[M.J.]: (Witness nodding head up and down)

THE COURT: Is that a 'yes'?

[M.J.]: 'Yes.'

* * *

[PROSECUTOR]: [M.J.], can you tell us what your full name is[?]

[M.J.]: [(M.J. provides her full name)]

[PROSECUTOR]: And you just turned four?

[M.J.]: (Witness nodding head up and down)

[PROSECUTOR]: Can you say it out loud?

[M.J.]: [(M.J. repeats her full name)]

* * *

[PROSECUTOR]: Where do you live, [M.J.]?

[M.J.]: In Oakwood.

[PROSECUTOR]: In Oakwood? Who do you live with?

[M.J.]: Mommy.

[PROSECUTOR]: Mommy? Who else lives with you?

[M.J.]: Stephanie.

[PROSECUTOR]: Stephanie? Who is Stephanie?

[M.J.]: My sister.

[PROSECUTOR]: Your sister. Who else lives with you? Do you have any other brothers or sisters?

[M.J.]: Kayla is my sister.

[PROSECUTOR]: And do you have any other sisters?

[M.J.]: (Witness shaking her head back and forth)

[PROSECUTOR]: Just Kayla?

[M.J.]: Just Stephanie.

[PROSECUTOR]: And Stephanie? Do you have any other sisters?

[M.J.]: Alana.

[PROSECUTOR]: And do you have a brother?

[M.J.]: Yes.

[PROSECUTOR]: What's your brother's name?

[M.J.]: Lucas.

[PROSECUTOR]: Lucas? Are you going to school this year, [M.J.]?

[M.J.]: (Witness shaking head back and forth)

[PROSECUTOR]: Where are you going to school?

[M.J.]: In preschool.

[PROSECUTOR]: In preschool? And do you know when you start school?

[M.J.]: (Witness shaking head back and forth)

[PROSECUTOR]: No? Pretty soon?

[M.J.]: (Witness shaking head up and down)

[PROSECUTOR]: Yes? Okay. Can you say your answers out loud for me.

[M.J.]: 'Yes.'

[THERESA]: Don't shake your head. Answer yes or no.

[PROSECUTOR]: [M.J.], do you remember when you had to go to the hospital?

[M.J.]: (Witness shaking her head back and forth)

[PROSECUTOR]: You don't remember?

[M.J.]: (Witness shaking her head back and forth)

[PROSECUTOR]: Do you remember having to talk to the police?

[M.J.]: (Witness shaking her head back and forth)

[PROSECUTOR]: Can you answer out loud for me[?]

[M.J.]: 'No'

[PROSECUTOR]: You don't remember?

[M.J.]: (Witness shaking head back and forth)

[PROSECUTOR]: Do you remember Mommy taking you to the hospital?

[M.J.]: No.

[PROSECUTOR]: No? Do you *** have a cousin named [respondent]?

[M.J.]: (No response)

[PROSECUTOR]: Do you?

[M.J.]: (Witness shaking her head back and forth)

[PROSECUTOR]: Can you answer our loud for me?

[M.J.]: 'No.'

[PROSECUTOR]: No? Did you see [respondent] in here today?

[M.J.]: (Witness nodding head up and down)

[PROSECUTOR]: Can you point to him?

[M.J.]: (No response)

[THERESA]: Listen to what [the prosecutor] is saying and answer her questions, okay?

[PROSECUTOR]: Can you point to [respondent]?

[M.J.]: (Witness shaking head back and forth)

[PROSECUTOR]: No? Did something bad happen to you?

[M.J.]: (Witness shaking head back and forth)

[PROSECUTOR]: You don't remember having to go to the hospital because something bad happened?

[M.J.]: (Witness nodding head up and down)

[PROSECUTOR]: You do remember going to the hospital?

[M.J.]: Um-um.

[THERESA]: She's getting confused.

[PROSECUTOR]: Do you want to talk to us?

[M.J.]: (No response)

THE COURT: She shrugs her shoulders.

[PROSECUTOR]: Can I have just a minute[?]

THE COURT: No, she's–she's being questioned. You can't talk to her separately.

[PROSECUTOR]: Okay.

[THERESA]: Can I say something or no?

THE COURT: No. That's part of the problem. We have to deal with it this way.

[PROSECUTOR]: Your Honor, I'm not going to ask any other questions.

THE COURT: [Defense counsel?]

[DEFENSE]: No questions, your Honor.

THE COURT: All right. You can go. Thank you."

¶ 23    The State then called M.J.'s brother Lucas to testify. Lucas, who was 7 years old at the time, testified that "something" happened to M.J. in his bedroom. He explained that he was in his room with respondent, M.J., and Alana, and that M.J. was lying down on the floor with her shirt on but without pants. When asked by the prosecutor what he saw happen to M.J., Lucas would only respond, "I'm scared." Defense counsel elected not to cross-examine Lucas.

¶ 24    Hogren testified consistently with his earlier testimony from the May 2011 section 115-10 hearing. Defense counsel objected to Hogren testifying about what M.J. told him during his October 26, 2010, interview with her, arguing that as testimonial statements, the hearsay was inadmissible because M.J. was unavailable for cross-examination. The trial court thereafter allowed Hogren to testify as to what M.J. told him because the State could recall M.J. to testify and he was conducting a bench trial. Hogren then proceeded to outline his interview with M.J.–namely, that "[respondent] put his finger in her pee-pee, and she pointed between her legs." Hogren also testified regarding his interview of respondent. Although respondent acknowledged being in Lucas's room with M.J., Lucas, and Alana, and showing them "pictures of naked ladies on his cell[ular] phone," he denied that he did what M.J. claimed that he had done.

¶ 25    After calling multiple witnesses to testify to the chain of custody of the DNA evidence, the State called Dana Pitchford, a forensic scientist, to testify about the swabs collected as evidence in this case. Pitchford testified that she tested M.J.'s sexual assault kit for the

presence of semen. Her conclusion was that semen was "indicated" but that no sperm cells were identified. As such, she could not be certain that semen was present.

¶ 26 Aaron Small, a second forensic scientist, testified regarding the DNA analysis conducted. Small explained that "a minor male DNA profile" existed in some of the loci–that is, the 15 markers that he uses when analyzing DNA samples–but did not exist in others. Respondent could not be excluded from the areas–the loci–in which the minor male DNA was detected. Statistically, that sample would indicate, as follows:

> "The statistics that would be given with the sample on the minor DNA profile were that it would be approximately one in a hundred thousand African-Americans, one in 7400 Caucasians, one in 16,000 Southwest Hispanics–Southwest Hispanic unrelated individuals cannot be excluded from that minor DNA profile at the loci that are listed–the areas that are listed where the foreign profile was detected."

Small explained that he used an Identifier Plus DNA test, implementing the 15 loci plus an additional "sex-determining" locus. Small's results revealed that respondent (a male, Caucasian minor) could not be excluded from seven loci but that the other nine loci showed no results. Small clarified those results as follows:

> "There are nine loci where I do not–I interpret the profile as there is no minor profile that is showing up in those loci. There is DNA that is to be for the victim's profile. Therefore, it is only at the seven loci that I actually got results. It's not saying that there aren't–it's not saying that the person or people are excluded from the remaining loci. It's saying that there's no result obtained from those loci."

¶ 27 At the close of the State's evidence, the trial court took up the issue of the section 115-10 statements from Hogren, given that the State did not recall M.J. to testify. Following arguments from the parties, the court admitted the statements, explaining its reasoning as follows:

> "I have to look at all the circumstances surrounding the statements to *** Hogren. The incident occurs on October [24]. She's taken to the hospital later that day. She makes her first statements to her mother sometime during the day on the [24th]. This is a three[-]year[-]old child. *** [On t]he 26th *** Hogren *** questions the three year old *** with the mother present. The child was called to testify[.] [She t]estified initially to preliminary matters and then essentially froze up. It's clear the child is unavailable as a witness."

The court thereafter decided to allow Hogren's testimony after finding that M.J.'s statements to police were not testimonial because those statements were (1) made as part of an initial series of questions to a child of tender years, and (2) not intended to be formal statements by the child.

¶ 28 In his defense, respondent called his father, Mike, to testify. As best we can tell, Mike's testimony was directed at impeaching Theresa's timeline of events.

¶ 29 On this evidence, and after closing arguments from counsel, the trial court found respondent guilty, explaining its finding as follows:

> "Well, I think it was an unintentional misstatement by [defense counsel], but ***

Small did not say that [respondent] couldn't be included. He said he couldn't be excluded. But he didn't say he couldn't be included because he said that there was a one in 7,400 possibility that it was someone else. He said that he couldn't be excluded. But it's clear that he can be included. 7 out of the 16 [loci] were identified as his. Out of the remaining 9 there were some which he couldn't identify at all. There was just no result obtainable from those [loci]. He didn't see a minimum profile. He needed to make a specific determination. Doesn't mean that [respondent's] DNA wasn't there, it wasn't enough to make a determination, so he included only the 7 that he was able to specifically identify. Which begs the question how otherwise does [respondent's] DNA wind up on a three[-]year[-]old child's underwear. [It] is not the statements of the mother that are the most important ones. The statements of the child. Was the door locked? Was there a scream? I don't know. It's clear, though, that the mother says that within five to ten minutes of [respondent] leaving [M.J.] comes down the stairs says she has to go to the bathroom. She tells her to go. She says she can't. Why[?] It hurts. Why[? Respondent] put spit on my pee pee. Up to that point in time[, Theresa] doesn't have any suspicion that there's anything going on. She's not the one fabricating a statement which the child doesn't reiterate to investigators. She relates what the child said to her and it's that point then that everything starts happening.

Was [Theresa] at the house all day or not[?] I don't know. What we do know is that the child told her that her pee pee hurt. That [respondent] put spit on my pee pee. *** Hogren spoke with her about a day and a half after that. And let's back up to Lucas. Lucas testified that they were all playing upstairs. [Respondent] was there with them. He saw something happen to [M.J.] but he couldn't tell what he saw. Something did happen in the bedroom. [Respondent] and [M.J.] and Alana were there. [M.J.] was lying down on the floor, her shirt was on but her pants weren't on. Then he indicated *** he was too scared to tell. That's also indicative of something that happened. It has nothing to do with the mother's statements. *** Hogren asked her if something happened she didn't like. She said [respondent] put his finger in her pee pee. She said she told Uncle Mike respondent put spit in her pee pee and put his penis on her. *** Hogren asked her if this happened and she said yes it did. Those are the statements of the minor. Those are the statements of the three[-]year[-]old. Everything else has to do with corroboration of the three[-]year[-]old's statements, because as is the nature of these cases[,] the most relevant evidence comes from the least capable relater. To disbelieve the child I have to assume that this three[-]year[-]old for some inexplicable reason would tell at least two people that [respondent,] her cousin[,] who appears to have no issues with her nor does she with him put his finger in her pee pee and put his penis on her. I have to assume that Lucas for some reason saw something happen to [M.J.] but indicated he couldn't tell what he saw. That something happened in the bedroom with [M.J.] lying down on the floor with her shirt on and her pants off, and that for some reason he would make that statement. I then have to try to assume that there would be some other explanation for semen indicated on the vaginal swab. I didn't hear any evidence that a three[-]year[-]old girl is capable of producing semen. It would be difficult to envision what circumstances would create the presence of semen on a three[-]year [-]old's underwear–I'm sorry, three[-]year[-]old's

vagina other than that one described by the three[-]year[-]old. It's difficult to envision how [respondent's] DNA would wind up on her underwear other than in the manner described by [M.J.] I don't have to rely on [Theresa]. I have the child who related it in the best way she could, in the only way she could with her limited ability to relate what happened. The circumstances under which her statements are made are indicative of the truthfulness of the statements. They're made shortly after the episode. There's neither time nor reason to fabricate. They contain information which she would not be normally likely to know or understand. And there's no reason to believe that she's not credible. When you couple that with the statements of Lucas, the DNA evidence, and the burden of proof isn't different because of the seriousness of the offense. The burden of proof remains the same. It's not like if it's a really serious offense there has to be a whole lot more evidence. There has to be proof beyond a reasonable doubt. I would have to somehow have a reasonable doubt that this three[-]year[-]old was not telling the truth which I don't, or some reasonable doubt as to some other explanation for [respondent's] DNA and the presence of semen on the child or in her underwear which I don't. In my opinion[,] that's more than sufficient evidence to establish proof beyond a reasonable doubt."

¶ 30 Shortly thereafter, the trial court sentenced respondent to the Illinois Department of Juvenile Justice for an indeterminate period not to exceed (1) the period for which an adult could be committed for the same act or (2) the date of respondent's twenty-first birthday (705 ILCS 405/5-750 (West 2010)), whichever occurred first.

¶ 31 This appeal followed.

¶ 32 II. ANALYSIS

¶ 33 Respondent appeals, arguing that (1) the trial court erred by (a) admitting M.J.'s hearsay statements to police under section 115-10 of the Criminal Procedure Code (725 ILCS 5/115-10 (West 2010)) because they were "unreliable" and (b) finding that statements M.J. made to police were not "testimonial," resulting in a violation of his right to confront M.J.; (2) he was provided ineffective assistance of counsel, given that counsel failed to object to the admissibility of certain scientific evidence; and (3) he was deprived of a fair trial because the State's evidence consisted of "unconstitutional hearsay testimony and inconclusive yet prejudicial scientific evidence." We address respondent's contentions in turn.

¶ 34 A. M.J.'s Statements to Hogren
¶ 35 1. *Respondent's Statutory Claim*
¶ 36 Respondent contends that the trial court erred by admitting M.J.'s hearsay statements to Hogren under section 115-10 because those statements were "unreliable." We disagree.

¶ 37 Section 115-10(b) of the Criminal Procedure Code provides that certain evidence shall be admitted as an exception to the hearsay rule under the following circumstances:

"(1) The court finds in a hearing conducted outside the presence of the jury that the time, content, and circumstances of the statement provide sufficient safeguards of

-13-

reliability; and

    (2) The child *** either:

        (A) testifies at the proceeding; or

        (B) is unavailable as a witness and there is corroborative evidence of the act which is the subject of the statement[.]" 725 ILCS 5/115-10(b) (West 2010).

¶ 38    At the section 115-10 hearing, "[the] trial court must evaluate the totality of the circumstances surrounding the making of the hearsay statements." *People v. Sharp*, 391 Ill. App. 3d 947, 955, 909 N.E.2d 971, 978 (2009). We agree with the Second District Appellate Court that wrote in *People v. Sundling*, 2012 IL App (2d) 070455-B, ¶ 30, 965 N.E.2d 563, that "[t]here are no precise tests for evaluating trustworthiness or reliability, but rather particularized guarantees of trustworthiness must be drawn from the totality of the circumstances surrounding the victim's statements." The factors a court may look to in making the reliability determination include the following: " '(1) the child's spontaneity and consistent repetition of the incident, (2) the child's mental state, (3) use of terminology unexpected of a child of similar age, and (4) the lack of motive to fabricate.' " *Sharp*, 391 Ill. App. 3d at 955, 909 N.E.2d at 978 (quoting *People v. Cookson*, 335 Ill. App. 3d 786, 791, 780 N.E.2d 807, 811 (2002), *aff'd*, 215 Ill. 2d 194, 830 N.E.2d 484 (2005)).

¶ 39    As the proponent of the out-of-court statements sought to be admitted under section 115-10, the State bears the burden of establishing that the statements are reliable and "not the result of adult prompting or manipulation." *Sharp*, 391 Ill. App. 3d at 955, 909 N.E.2d at 978. However, when the trial court finds that the State has met its burden, a reviewing court will not reverse that finding unless the record demonstrates that the court abused its discretion. *Id.* " 'An abuse of discretion occurs when the [court's] ruling is arbitrary, fanciful, or unreasonable, or when no reasonable person would take the same view.' " *Id.* (quoting *People v. Robertson*, 312 Ill. App. 3d 467, 469, 727 N.E.2d 404, 406 (2000)).

¶ 40    In this case, the trial court's finding that M.J.'s statements to Hogren were reliable was not an abuse of the court's discretion. Indeed, all four factors outlined in *Sharp* support the court's finding that the statements were reliable. M.J.'s initial statements to Theresa were spontaneous and her later statements to Hogren were totally consistent with the statements she made to Theresa. Morever, Hogren testified that M.J.'s responses to him, as well as interactions with him, were entirely consistent with what he would expect from a child of M.J.'s tender years. Additionally, the terminology M.J. used to describe the incident was the type of terminology one would expect from a child of M.J.'s experience–for example, M.J. used the phrase "pee pee" to describe her private parts. Finally, M.J. lacked any motive to fabricate–in fact, M.J.'s reaction to questions on direct examination at trial would indicate that she was less than enthusiastic about recounting what had happened. In sum, M.J.'s statements about what respondent had done to her were timely, consistent, and in her own words.

¶ 41    Accordingly, we conclude that the trial court did not abuse its discretion by admitting M.J.'s statements to Hogren regarding the criminal sexual abuse respondent perpetrated against her pursuant to section 115-10 of the Criminal Procedure Code (725 ILCS 5/115-10 (West 2010)). Those statements were reliable.

¶ 42                                                   *2. Respondent's Constitutional Claim*

¶ 43      Respondent also contends that the trial court erred by finding that the statements M.J. made to Hogren regarding what happened to her "pee pee" were not "testimonial." Respondent asserts that his sixth amendment right to confront M.J. was violated when the court admitted these testimonial hearsay statements.

¶ 44      Somewhat inexplicably, the State–citing *People v. Learn*, 396 Ill. App. 3d 891, 919 N.E.2d 1042 (2009), a case that much of the Illinois judiciary has distanced itself from (see *People v. Vannote*, 2012 IL App (4th) 100798, ¶ 31, 970 N.E.2d 72 (listing cases that have specifically distinguished *Learn*, including some from the same appellate court district)), and that our research reveals no court has cited approvingly–initially conceded that M.J. was unavailable. Nevertheless, the State argues that M.J.'s statements to Hogren were not testimonial and therefore were properly admitted. Because the record shows that M.J. was available for cross-examination, we reject the State's concession and conclude that respondent was not denied his constitutional right to confront M.J.

¶ 45      In *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004), the United States Supreme Court held that, under the confrontation clause, testimonial statements of a witness who does not testify at trial are inadmissible unless (1) the witness is "unavailable" and (2) the defendant had a prior opportunity to cross-examine the witness. When the declarant appears for cross-examination at trial, however, the confrontation clause "places no constraints at all on the use of [the] prior testimonial statements." *Crawford*, 541 U.S. at 59 n.9. Accordingly, we turn to whether the declarant in this case, M.J., appeared for cross-examination.

¶ 46      As this court has repeatedly noted, the key inquiry when determining whether a declarant is available for cross-examination is whether the declarant was "present for cross-examination and answered questions asked of her by defense counsel." *People v. Bryant*, 391 Ill. App. 3d 1072, 1083, 909 N.E.2d 391, 401 (2009); *Sharp*, 391 Ill. App. 3d at 955, 909 N.E.2d at 977.

¶ 47      In *Bryant*, the seven-year-old victim testified on direct examination that the defendant put his "private part in her bottom." *Bryant*, 391 Ill. App. 3d at 1083, 909 N.E.2d at 401. However, the victim did not testify about how the defendant also made her put her mouth on his private part, a statement that investigators testified the victim made to them. *Id.* On cross-examination, the victim answered all the questions put to her by the defense, but the defense did not cross-examine her regarding whether the defendant made her put her mouth on his private part (*id.*)–that is, defense counsel did not ask her about the statements that he later complained violated his right to confront the witness. The defendant argued that the victim was required to testify from the witness stand about the statements she made to investigators, despite the defense failure to conduct any cross-examination about those statements. *Id.* On these facts, this court concluded that the confrontation clause was not implicated because the victim was "available" for cross-examination, even though the victim had an "apparent unwillingness or inability to testify on direct examination about [the] defendant's making her put her mouth on his private part." *Id.*

¶ 48      In this case, as in *Bryant*, the victim was available for cross-examination. M.J. was

present for cross-examination but did not answer any questions about the events which were the subject of her statements to Hogren because defense counsel did not ask M.J. any questions about those events. Despite M.J.'s apparent unwillingness or inability to testify on direct examination about these events, M.J. "appeared" for cross-examination at trial within the meaning of the confrontation clause. M.J. appeared for cross-examination because defense counsel could have cross-examined her but chose not to do so. M.J.'s failure to testify about her statements to Hogren on direct examination does not relieve respondent of his obligation to cross-examine M.J. See *Bryant*, 391 Ill. App. 3d at 1083, 909 N.E.2d at 401 (explaining that the focus must be on the defendant's ability to confront the witness, reserving for another day what the legal consequences would be if the witness answered some, but not all, of defense counsel's questions). Thus, under *Crawford*, the hearsay statements offered at trial regarding M.J.'s "pee pee" were a constitutional nonevent. As such, even if M.J.'s statements to Hogren constituted testimonial hearsay–a contention we need not further address–they were admissible at trial.

¶ 49    In so concluding, we note other recent decisions of this court and our sister appellate districts that have addressed the same issue and reached the same result. In *People v. Sharp*, the trial court granted the State's motion to introduce certain hearsay statements of the victim under section 115-10 of the Criminal Procedure Code, but when the victim testified at trial and was asked what the defendant did to her when they were alone inside the room where the sexual assault took place, she would not respond. *Sharp*, 391 Ill. App. 3d at 951, 909 N.E.2d at 975. On cross-examination, the victim answered all of defense counsel's questions (which were of a general sort), but counsel elected not ask her any questions as to what happened in the room when the defendant and she were in it together. *Id.* On appeal, we rejected the defendant's argument that the admission of the victim's hearsay statements pursuant to section 115-10 of the Criminal Procedure Code violated his right of confrontation, concluding that because the victim appeared for cross-examination at trial, the confrontation clause placed no constraints at all on the use of her prior testimonial statements. *Id.* at 953, 909 N.E.2d at 976. In so concluding, this court noted that the victim answered all of the questions put to her by defense counsel even though counsel made no attempt to cross-examine her regarding what his client did while in the room with her. *Id.*

¶ 50    Similarly, in *People v. Garcia-Cordova*, 2011 IL App (2d) 070550-B, 963 N.E.2d 355, the defendant was convicted of three counts of predatory criminal sexual assault of a child and argued on appeal that the trial court erred by admitting hearsay testimony of the victim pursuant to section 115-10 of the Criminal Procedure Code. Specifically, although the victim testified at trial, she did not testify regarding any criminal conduct of the defendant. Citing *Learn*, the defendant argued "that a victim's testimony must be accusatory and must establish each of the elements of the counts against [the] defendant in order for the victim to have appeared for cross-examination." *Id.* ¶ 53, 963 N.E.2d 355. The Second District Appellate Court in *Garcia-Cordova* (the same court that earlier had rendered the *Learn* opinion) rejected this argument and, in doing so, cited approvingly this court's decisions in *Bryant* and *Sharp*. The court also pointed out that the defendant choose not to cross-examine the victim in this case. The court then addressed that matter as follows:

   "Where a defendant does not attempt to cross-examine a witness on her out-of-court

statements, he cannot complain that the witness was unavailable for cross-examination. *People v. Lewis*, 223 Ill. 2d 393, 405[, 860 N.E.2d 299, 306] (2006). A witness who is present for cross-examination and answers questions is available for cross-examination even when defense counsel chooses to let the witness's direct testimony stand. *People v. Major-Flisk*, 398 Ill. App. 3d 491, 506[, 923 N.E.2d 324, 336] (2010). We agree with the court in *People v. Lara*, 2011 IL App (4th) 080983-B, ¶ 51[, 958 N.E.2d 719]:

> 'In a situation such as this, defense counsel is placed in a precarious position. In general, during any trial, an attorney does not want to ask a question if he does not know how the witness will answer. Further, an attorney surely does not want to elicit an answer that will implicate his client. However, strategic considerations such as these do not make the witness unavailable for cross-examination.' " *Id.* ¶ 63, 963 N.E.2d 355.

¶ 51    In *People v. Major-Flisk*, the decision of the First District Appellate Court cited approvingly by *Garcia-Cordova*, the same issue was presented–namely, the admissibility of the victim's hearsay statements under section 115-10 of the Criminal Procedure Code when the victim's testimony at trial was far less incriminating of the defendant. The First District cited approvingly this court's decisions in *Bryant*, *Sharp*, and *People v. Kitch*, 392 Ill. App. 3d 108, 915 N.E.2d 29 (2009), and noted that the victim in the case before it

> "was present for cross-examination and answered all of the questions posed to him by defense counsel. Although counsel chose not to do so, he certainly could have cross-examined [the victim] about his testimony that defendant touched him, whether defendant touched him in any other way, or his inability to remember certain conversations. However, as noted, counsel chose to let [the victim's] direct testimony stand and attempted to use it to destroy the force of [the victim's] hearsay statements. [Citations.] Accordingly, we find that the admission of [the victim's] hearsay statements did not violate defendant's rights under the confrontation clause or *Crawford*." *Major-Flisk*, 398 Ill. App. 3d at 506-07, 923 N.E.2d at 336.

¶ 52    B. Respondent's Claim That His Counsel Provided Ineffective Assistance

¶ 53    Respondent next contends that he was provided ineffective assistance of counsel, given that his attorney failed to object to the admissibility of the scientific evidence the State introduced at trial. Specifically, respondent asserts that his counsel was ineffective for failing to challenge the reliability and relevance of the "extremely speculative DNA and 'semen' evidence" that the court considered in finding him guilty. We disagree.

¶ 54    Ineffective-assistance-of-counsel claims are reviewed under the familiar standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). Reversal under *Strickland* requires defendant to prove that (1) the conduct of trial counsel fell below an objective standard of reasonableness (*Strickland*, 466 U.S. at 687-88) and (2) the deficient performance prejudiced defendant such that a "reasonable probability" exists that the result would have been different but for the deficient performance (*Strickland*, 466 U.S. at 694).

¶ 55    The gravamen of respondent's complaint here is that the DNA and semen evidence was so speculative and inconclusive that allowing the trial court to consider it was improper

because that evidence was far more prejudicial than probative. However, this characterization of the State's DNA and semen evidence ignores the fact that the court, as the fact finder, understood the limitations of the evidence. Scientific evidence, like the DNA and semen evidence in this case, is not required to be absolutely conclusive. Instead, the question is whether the evidence is useful; it is a question of degree. Here, the court recognized that the DNA evidence was not absolutely conclusive but was certainly useful in limiting the spectrum of possible perpetrators–a fact the court clearly understood after defense counsel executed a thorough cross-examination of the State's expert. Moreover, a review of the court's findings reveals that it likewise understood the limits of the State's semen evidence. A close reading of the court's findings reveals that, rather than viewing the DNA and semen evidence as absolutely conclusive of respondent's guilt, the court merely considered the DNA and semen evidence as a supplement to the primary evidence–namely, M.J.'s statements to Theresa and Hogren, as well as Lucas's testimony corroborating the circumstances surrounding the incident. The court explained as much in its specific findings, as follows:

> "What we do know is that the child told [Theresa] that her pee pee hurt. That [respondent] put spit on my pee pee. *** Hogren spoke with her about a day and a half after that. *** Lucas testified that they were all playing upstairs. [Respondent] was there with them. He saw something happen to [M.J.] but he couldn't tell what he saw. Something did happen in the bedroom. [Respondent] and [M.J.] and Alana were there. [M.J.] was lying down on the floor, her shirt was on but her pants weren't on. Then he indicated the he was too scared to tell. That's also indicative of something that happened. It has nothing to do with the mother's statements. *** *Everything else has to do with corroboration of the three[-]year[-]old's statements, because as is the nature of these cases[,] the most relevant evidence comes from the least capable relater.* To disbelieve the child I have to assume that this three[-]year[-]old for some inexplicable reason would tell at least two people that respondent[,] her cousin[,] who appears to have no issues with her nor does she with him put his finger in her pee pee and put his penis on her. I have to assume that Lucas for some reason saw something happen to [M.J.] but indicated he couldn't tell what he saw. That something happened in the bedroom with [M.J.] lying down on the floor with her shirt on and her pants off, and that for some reason he would make that statement. I then have to try to assume that there would be some other explanation for semen indicated on the vaginal swab. I didn't hear any evidence that a three[-]year[-]old girl is capable of producing semen. It would be difficult to envision what circumstances would create the presence of semen on a three[-]year[-]old's underwear–I'm sorry, three[-]year[-]old's vagina other than that one described by the three[-] year[-]old. It's difficult to envision how [respondent's] DNA would wind up on her underwear other than in the manner described by [M.J.]" (Emphasis added.)

¶ 56    Because the record shows that the trial court properly considered the DNA and semen evidence, we conclude that defense counsel's failure to object to the admission of that evidence did not amount to ineffective assistance of counsel under either prong of the *Strickland* test.

-18-

¶ 57　　　　　　　　C. Respondent's Claim That He Was Deprived of a Fair Trial

¶ 58　　Respondent next contends that he was deprived of a fair trial because the State's evidence consisted of "unconstitutional hearsay testimony and inconclusive yet prejudicial scientific evidence." In this regard, respondent asserts that the integrity of the judicial process has been compromised because the court permitted unconstitutional hearsay evidence and inconclusive scientific evidence. We disagree.

¶ 59　　As we have already explained, M.J.'s statements to Hogren, as well as the DNA and semen evidence, were properly admitted and appropriately considered by the trial court. Essentially, respondent's contention is that he was deprived of a fair trial because of the cumulative effect of the court's errors. However, the court did not err by admitting M.J.'s hearsay statements, nor did the court err by considering the scientific evidence. Therefore, no cumulative error exists. See *People v. Bowens*, 407 Ill. App. 3d 1094, 1111, 943 N.E.2d 1249, 1266 (2011) ("Cumulative error requires reversal when, *as a result of multiple trial court errors*, a defendant is denied a fair trial." (Emphasis added.)). Accordingly, we reject respondent's claim that he was not provided a fair trial.

¶ 60　　　　　　　　　　　　III. CONCLUSION

¶ 61　　For the reasons stated, we affirm the trial court's judgment.

¶ 62　　Affirmed.