2023 IL App (1st) 230233-U

No. 1-23-0233

Order filed September 28, 2023

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Winnebago County. |
| | ) | |
| v. | ) | No. 18 CF 173 |
| | ) | |
| JOSHUA HENSON, | ) | Honorable |
| | ) | Brendan Maher, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE HOFFMAN delivered the judgment of the court.
Presiding Justice Rochford and Justice Martin concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's convictions for predatory criminal sexual assault of a child are affirmed over his contentions that the State's evidence was deficient and the trial court entered inconsistent findings.

¶ 2    Following a bench trial, defendant Joshua Henson was found guilty of three counts of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2016)), and sentenced to a total of 26 years' imprisonment. On appeal, defendant argues that he was not proven guilty

beyond a reasonable doubt where the State's evidence was deficient and the trial court entered inconsistent findings. For the following reasons, we affirm.

¶ 3 Defendant was charged by indictment with four counts of predatory criminal sexual assault of a child against his biological daughter W.H. Each offense allegedly occurred between March 1, 2017, and September 1, 2017, when defendant was age 17 or older and W.H. was under age 13. The indictment alleged that defendant, knowingly, placed his finger into W.H.'s vagina (count I), put his penis in W.H.'s mouth (count II), and put his penis in W.H.'s anus (counts III-IV). The conduct in counts I and II allegedly occurred in Winnebago County, while the conduct in counts III and IV allegedly occurred in the cities of Loves Park and Rockford, respectively.

¶ 4 Prior to trial, the State filed a motion to admit evidence of certain out-of-court statements by W.H. pursuant to section 115-10 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-10 (West 2020)). Following a hearing, the court allowed W.H.'s statements to (1) Dawn W., W.H.'s maternal grandmother; (2) Lindsey Funk, a therapist for Youth Services Network; and (3) Joanna Deuth, a child forensic interviewer for Carrie Lynn Children's Center, provided that W.H. would also testify at trial.

¶ 5 The cause proceeded to trial in March 2021. Evidence established that in December 2014, defendant moved into a house in Rockford (Rockford residence) with his girlfriend and some of his children, including G.H. and A.H. In March or April 2017, defendant moved to the condominium of a friend, Adam Faber, in Loves Park (Loves Park residence). W.H. lived in an apartment with her mother, Raquel W., but also stayed at the Rockford residence and sometimes spent the night at Dawn W.'s house.

¶ 6     W.H. testified that she was 11 years old and born in January 2010.[1] The State asked what she would testify about. W.H. answered, "[g]etting sexually abused by my father," and stated defendant's first and last name. The court then requested that everyone present remove their masks. The State asked W.H. whether she saw her father in the courtroom; she responded, "No."

¶ 7     W.H. last saw defendant "five years" before trial, when she was "[e]ight." That day, defendant drove W.H. to the Loves Park residence where he had a room in the basement. W.H. thought they would swim. While driving, defendant asked W.H. whether she had showered. She said no. W.H. and defendant went to an upstairs bathroom, disrobed, and entered the shower. Defendant's hand touched W.H.'s "private areas" on the "inside," causing pain. The State asked whether that was where "you would go pee with," and W.H. agreed. She did not recall defendant doing anything to her "butt" that day.

¶ 8     Sometime before the incident at the Loves Park residence, defendant lived at the Rockford residence. Once, when W.H. was six years old, she and defendant were alone in that house. Both were naked. W.H. laid down in defendant's bedroom, and he used his "private area" to touch the inside of her "private area" that she "pee[s] out of." In the first house, defendant also used his private area to touch her butt; both types of contact occurred on multiple occasions and were painful. Defendant never touched W.H.'s butt with his "private area" at the Loves Park residence.

¶ 9     On cross-examination, W.H. stated that she lived at the Rockford residence between ages five and eight. W.H. had to follow rules and do chores there, unlike at Raquel W.'s house. W.H. agreed that Raquel W. had "boys and girls over" and W.H. once observed Raquel W. having sex

_____

[1] During its case-in-chief, the defense requested judicial notice of court records establishing that defendant admitted to parentage of W.H. and that her last name had been legally changed.

with a man. On redirect examination, W.H. stated that defendant sometimes touched her in the shower or in his bedroom while G.H. was downstairs at the Rockford residence.

¶ 10 Dawn W. testified that in December 2017, W.H. visited her and they spoke about "twerking" and "nicer ways that you can express yourself in dance." W.H. then volunteered that "one particular time *** her dad had touched her inappropriately." According to W.H., the incident occurred on a day when defendant had picked her up so they could swim. Defendant brought her to the Loves Park residence, where they went downstairs. Defendant told W.H. to remove her clothes and "get in bed." W.H. complied. Then, defendant moved his head under the blankets "down there"; according to Dawn W., W.H. gestured "towards her privates." Then, W.H. reported that defendant turned her onto her stomach and did something to her that "hurt really bad."

¶ 11 Dawn W. was present when defendant picked up W.H. to go swimming, which occurred sometime that summer. When W.H. returned, she said that her "butt hurt" and asked for diaper rash cream. Afterwards, when W.H. would visit Dawn W., she would not go upstairs alone and would not use the upstairs shower unless Dawn W. was also upstairs.

¶ 12 On cross-examination, Dawn W. agreed that defendant "just showed up randomly" when he picked up W.H. from Raquel W.'s home and said they would go swimming. Dawn W. did not observe defendant when he arrived or drove away, and did not know whether anyone was with him. When W.H. returned, she was "upset" because "they never went swimming." Eventually, W.H. stated that "her butt [was] hurting." Dawn W. asked whether W.H. had hard stool or was constipated, and W.H. responded that she "had a hard time going to the bathroom." During the conversation in December 2017, W.H. used the phrases "butt" and "down there," and did not use the word "tush" in reference to her vagina. W.H. did not use the word "penis." W.H. appeared "a

little hesitant" or "embarrassed," but was "[s]traightforward." Only after the December 2017 conversation, Dawn H. noticed that W.H. would not go upstairs and shower alone. On redirect examination, Dawn H. stated that when W.H. described what defendant did to her while she was "on her stomach," she said, "it hurt so bad because my dad is big down there."

¶ 13    Funk, the therapist, testified that she began working with W.H. in December 2017. During the first appointment, Funk asked W.H. whether "anyone ever asked [her] to do anything sexual with touch or penetration that [she] didn't want to do." W.H. reported that "her dad touched her and she was scared." According to W.H., defendant touched her five times "[i]n her private area," which occurred "before school started." W.H. did not gesture toward her body when she spoke, but acted withdrawn, sad, and agitated.

¶ 14    On cross-examination, Funk explained that she met W.H. in connection with W.H.'s "grandmother *** trying to obtained guardianship of her." Funk had not been trained in child forensic interviewing, and did not ask W.H. where the incident occurred or whether anyone else was present. After W.H. related what happened, Funk told her she was brave and they played a game. Funk agreed that the sessions also addressed "lying and stealing." On redirect examination, Funk agreed that children who suffer abuse or trauma may "act out."

¶ 15    Deuth, the child forensic interviewer, testified that she interviewed W.H. on December 28, 2017. The interview was filmed, and a copy was entered into evidence and is included in the record on appeal. During the interview, Deuth gave W.H. diagrams of the front and back of a female child. W.H. circled the vaginal area and referred to it as the "tush," and circled the buttocks and referred to it as the "bottom." Deuth also gave W.H. diagrams of the front and back of a male

child; W.H. circled the area of the penis and referred to it as the "private part." These drawings were entered into evidence and are included in the record on appeal.

¶ 16     On questioning by the defense, Deuth stated that children may refer to their "private parts" using different words during an interview.[2] Deuth agreed that offering a "reward" for participating in a forensic interview creates "a possibility of tainting the interview."

¶ 17     On redirect examination, Deuth agreed that a child who discloses an incident to someone might not repeat the disclosure in a forensic interview. W.H.'s language was "child appropriate" and her demeanor, including her reluctance to answer some questions, did not suggest that she had been "coached."

¶ 18     The videorecording of the interview, which this court has viewed, depicts Deuth and W.H. in a room. Deuth explains that the interview will be recorded and observed by people behind a one-way mirror, and they will discuss "true" things that "really happened." W.H. nods. Deuth then asks W.H. whether she knows why they are together; W.H. responds that her mother and grandmother said she had a "meeting," but did not explain why. Deuth asks W.H. whether "something happened"; W.H. responds, "my dad did something inappropriate." Deuth asks what happened, and W.H. explains that her father, "Joshua Henson," would "always ask" whether she showered. When W.H. said "no," defendant would shower with her. Deuth asks what occurred in the shower, and W.H. says that she does not "like talking about it a lot."

¶ 19     W.H. explains that defendant lived at a "first house" and a "second house." Initially, she denies that something occurred in the shower at the first house and says she does not remember

_____

[2] The defense declined to cross-examine Deuth, but with leave from the court and no objection by from the State, questioned Deuth regarding the video interview in the manner of a direct examination.

anything inappropriate happening there. Later, however, W.H. states that defendant showered with her "more than one time" at "both houses." W.H. was six years old the first time defendant showered with her. He was naked and said that W.H. had a rash on "both of [her] private parts." Deuth asks whether defendant did anything; W.H. responds that he did something "after the shower," but she does not want to talk about it.

¶ 20    On another occasion, defendant got into his bed with W.H. while neither was clothed. W.H. "didn't want to do that." This conduct first occurred sometime after the initial incident in the shower, and happened at "both houses." G.H. was sometimes home when this conduct occurred at the first house, but no one else was present when the conduct happened at the second house.

¶ 21    On one occasion at the second house, after W.H. showered, defendant gave her a towel and sent her to a bed downstairs. Defendant "got on top" of W.H. and his "private part" touched her bottom, which "hurt." Defendant told her to stop crying and that he would spank her if she told anyone what happened. Faber lived at the second house but was not there when this occurred; rather, he was "always gone."

¶ 22    During the interview, Deuth shows W.H. the diagram of the girl. W.H. circles the girl's buttocks and says that defendant would touch the inside of her "bottom" with his "private part," which hurt. W.H. also circles the girl's vaginal area, gestures forward with her hand, and says that defendant "put his finger up inside my tush," which also hurt. Deuth asks whether defendant touched her "tush" with "any other part," and W.H. shakes her head "no." Then, Deuth asks whether defendant touched her "tush" with his hand and her "bottom" with his "private part"; W.H. nods affirmatively to both questions and confirms that both types of conduct occurred at the first and second house. She adds that once, in the second house, defendant put a towel over her

eyes and put his "private part" in her mouth. Later, Deuth shows W.H. the diagram of the boy and asks her to circle the area she calls the "private part." W.H. circles the genitals. Defendant did not make her touch him and she did not remember what his "private part" looked like.

¶ 23 Incidents at both houses occurred when W.H. was six years old, and one incident occurred at the second house when she was seven. W.H. did not remember her grade in school when these events happened. At the first house, incidents occurred in defendant's bedroom and in the bathroom. No incidents occurred anywhere besides the first and second houses, and no other adult showed his private parts to W.H., but she related another incident when she did not finish cleaning her room and defendant hit her until her nose bled. She did not remember the last time she saw defendant, and thought he moved to Colorado.

¶ 24 A few nights before the interview, W.H. told Dawn W. "everything that happened with my dad." Dawn W. responded that W.H. would "never go" with defendant again, which was "fine" with W.H. because she did not want to "go with him again anyways." W.H. did not talk with anyone else after talking to Dawn H. Near the end of the interview, W.H. volunteers that Dawn W. said W.H. could get something at the store if she "did really good." Deuth asks whether Dawn W. told W.H. what to say; W.H. says no.

¶ 25 Shannon Krueger, a pediatric nurse practitioner, testified as an expert in physical and sexual child abuse. Krueger examined W.H. on January 18, 2018, and knew that she had already undergone a forensic interview. W.H. reported that she visited defendant that summer and afterwards, "had pain in her butt area" and "was unable to poop." Krueger determined that W.H. had an anal fissure, but could not determine the cause. Anal fissures could result from a large bowel movement following constipation, straining on the toilet, or penetration or trauma to that

area of the body. As anal fissures typically heal in 7 to 10 days, Krueger did not believe that W.H.'s injury resulted from penetration months before the exam. Because injuries from anal and vaginal penetration heal, however, "a normal exam does not mean that sexual abuse did not occur."

¶ 26    On cross-examination, Krueger testified that W.H. had abrasions on her forehead and nose, and stated that Raquel W. struck her the previous day, but "had never done anything like that before." Krueger prepared a report documenting the examination.

¶ 27    On redirect examination, Krueger stated it is "very common" to find "no abnormalities" in the hymen of children who have been sexually abused. W.H. also told Krueger that after "another time" when defendant "did it for a while," she felt "burning when she peed, but that went away." Kruger did not observe anything concerning regarding Raquel W.'s interactions with W.H. On recross examination, Krueger stated that she reported W.H.'s facial abrasions to the Department of Children and Family Services.

¶ 28    Defendant called Carrie Edwards, a sexual assault nurse examiner and advanced forensic nurse, who testified as an expert in that field. Edwards testified that she reviewed Krueger's report. According to Edwards, anal fissures are "not uncommon" for children and could result from constipation, diarrhea, incontinence, other conditions, or sexual assault. Edwards agreed with defense counsel that anal fissures are not "diagnostic of sexual abuse," and that Krueger's report did not reflect that W.H. exhibited unusual behavior indicative of sexual abuse. On cross-examination, Edwards agreed that most injuries to the vaginal area, excluding complete transections of the hymen, heal over time.

¶ 29    Faber testified that he and defendant met at work and became friends. In March 2017, defendant moved into Faber's residence in Loves Park. Faber only saw W.H. at the Loves Park

residence once, when she arrived to care for a dog. Faber never observed defendant enter or exit a bathroom with W.H. and never saw them together in bed. At one point, defendant kept a nonfunctional vehicle at the house. On cross-examination, Faber stated that defendant lived in the basement and neither man was present "24/7."

¶ 30    G.H. testified that she lived at the Rockford residence with defendant and his girlfriend when she was five or six years old.[3] W.H., who was about the same age, sometimes stayed there. On those days, W.H. and G.H. would come home from school together and play, do homework, eat dinner, and get ready for bed together. G.H. shared a room with W.H. and another sister, A.H. W.H. and G.H. were "pretty close" and told each other secrets. G.H. never saw W.H. upset, and never saw defendant shower with W.H., hit her, or be alone with her in his bedroom. On cross-examination, G.H. stated when she was five or six years old, defendant had a vehicle that he drove.

¶ 31    Christy Henson, defendant's mother, testified that "there was a lot of arguing" between defendant and Raquel W.'s girlfriend.[4] In June or July 2012, Raquel W. confronted defendant outside Christy's house because she "did not want him around" and did not "want him to be dad" to W.H. "because she was taking over."

¶ 32    When defendant lived at the Rockford residence, Christy visited almost daily to prepare the children for school, take them to the bus stop, and drive defendant to work. Later in the day, Christy would pick up the children and defendant, and drive them to the Rockford residence. When defendant moved to the Loves Park residence in 2017, Christy still drove him to work every day. To Christy's knowledge, W.H. never lived at the Loves Park residence, but had visited there with

---

[3] G.H. testified that her mother is not Raquel W.

[4] As defendant and Christy Henson have the same last name, we refer to Christy by her first name.

Christy on Easter 2017. When W.H. visited Christy's house, she did not exhibit odd behavior while showering and was not afraid to go upstairs or downstairs. On cross-examination, Christy testified that on one occasion, she went to the Loves Park residence with W.H. to care for a dog while Faber was present.

¶ 33    Defendant testified that he did not digitally penetrate W.H.'s vagina, did not place his penis in her anus or mouth, and did not shower with her. He denied driving to pick up W.H. from Raquel W.'s residence and driving her to the Loves Park residence in 2017.

¶ 34    The trial found defendant guilty of predatory criminal sexual assault of a child on count I (finger to vagina), count III (penis to anus in the Loves Park residence), and count IV (penis to anus in the Rockford residence), and found him not guilty of count II (penis to mouth). The court noted that W.H. did not identify defendant as her father in court, but his identity was undisputed and he was "the father to whom [W.H.] was referring." The court also observed that W.H., age 11, testified regarding events that occurred when she was "four years younger," and was "generally credible within the limits of her memory." In reaching this conclusion, the court considered "the extent to which W.H.'s testimony was corroborated by the testimony of other witnesses who were permitted to testify" regarding her out-of-court statements. According to the court, defendant's demeanor was sometimes "hostile" and his testimony was "selectively evasive".

¶ 35    Trial counsel filed a posttrial motion arguing that the State failed to prove defendant's guilt beyond a reasonable doubt. Defendant then discharged trial counsel and retained new posttrial counsel, who filed an additional motion that also challenged the sufficiency of the evidence. In the motion, posttrial counsel further argued that "the State did not adequately establish that the victim's hearsay statements were reliable within the meaning of section 115-10" and the trial court's

findings may have been "inconsistent" because "a finding of not guilty is inconsistent with contrary finding[s] when based on the same testimony (of complainant) and no other evidence."

¶ 36     At a hearing, posttrial counsel advised the court that he would adopt and incorporate the posttrial motion filed by trial counsel. Following argument, the trial court denied the posttrial motions.

¶ 37     After a sentencing hearing, the court imposed consecutive prison terms of 10 years (count I), 8 years (count III), and 8 years (count IV), for a total of 26 years' imprisonment. The record does not reflect that defendant filed a motion to reconsider sentence.

¶ 38     On appeal, defendant first argues that he was not proven guilty beyond a reasonable doubt where W.H. did not identify him in court, no physical evidence or eyewitnesses aside from W.H. implicated him, he maintained his innocence, and defense witnesses refuted the allegations.

¶ 39     The standard of review for a challenge to the sufficiency of the evidence is "whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Internal quotation marks omitted.) *People v. Belknap*, 2014 IL 117094, ¶ 67. The trier of fact weighs the evidence, resolves conflicts in the testimony, and draws reasonable inferences from basic facts to ultimate facts. *People v. Brown*, 2013 IL 114196, ¶ 48. Accordingly, this court will not substitute its judgment for that of the trier of fact on the weight of the evidence or credibility of witnesses. *Id*. A reviewing court must allow all reasonable inferences from the record in favor of the prosecution (*People v. Cunningham*, 212 Ill. 2d 274, 280 (2004)) and will not reverse a conviction unless the evidence is "unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt" (*People v. Jackson*, 232 Ill. 2d 246, 281 (2009) (internal quotation marks omitted)).

¶ 40    As charged, a person commits the offense of predatory criminal sexual assault of a child when he is 17 years of age or older and "commits an act of contact, however slight, between the sex organ or anus of one person and the part of the body of another for the purpose of sexual gratification or arousal of the victim or the accused, or an act of sexual penetration, and *** the victim is under 13 years of age." 720 ILCS 5/11-1.40(a)(1) (West 2016). "Sexual penetration" is defined as "any contact, however slight, between the sex organ or anus of one person and *** the sex organ, mouth, or anus of another person, or any intrusion, however slight, of any part of the body of one person *** into the sex organ or anus of another person, including, but not limited to, cunnilingus, fellatio, or anal penetration." 720 ILCS 5/11-0.1 (West 2016).

¶ 41    Evidence is sufficient to support a conviction for predatory criminal sexual assault of a child if the victim describes (1) the kind of acts committed with sufficient specificity, (2) the number of acts committed with sufficient specificity, and (3) the time period the acts occurred generally. *People v. Letcher*, 386 Ill. App. 3d 327, 334 (2008). As the supreme court has recognized, "it is often difficult in the prosecution of child sexual abuse cases to pin down the times, dates, and places of sexual assaults, particularly when the defendant has engaged in a number of acts over a prolonged period of time." *People v. Bishop*, 218 Ill. 2d 232, 247 (2006).

¶ 42    It is undisputed that defendant was over 17 years old and that W.H. was under 13 years old when the charged offenses occurred. At trial, W.H. testified that defendant abused her at the residences in Rockford and Loves Park. She stated that, on multiple occasions, defendant touched her anus and vagina with his penis, causing pain. She also described an incident when defendant drove her to the Loves Park residence; W.H. thought they would swim, but instead they disrobed and entered a shower. Defendant then used his hand to touch the inside of her vagina, again causing

pain. Dawn H. testified that she recalled the day that defendant picked up W.H. to go swimming, and that when W.H. came home, she said that her "butt hurt" and asked for diaper rash cream. Notably, in the videorecorded interview, W.H. told Deuth about an incident at the Loves Park residence when she showered and then got into a bed, where defendant touched her anus with his penis. She also told Deuth that defendant penetrated her vagina with his finger and penetrated her mouth with his penis. Funk also testified that W.H. described defendant touching her "[i]n her private area." Additionally, Krueger testified that W.H. reported that she visited defendant during the summer and afterwards, "had pain in her butt area" and "was unable to poop."

¶ 43    Viewed in the light most favorable to the State, this evidence established beyond a reasonable doubt that defendant committed predatory criminal sexual assault of a child predicated on touching W.H.'s vagina with his finger and touching her anus with his penis. See *Belknap*, 2014 IL 117094, ¶ 67. While no physical evidence or testimony of eyewitnesses other than W.H. was adduced at trial, W.H.'s testimony alone sufficed. See *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009) ("the testimony of a single witness, if positive and credible, is sufficient to convict"). Indeed, a victim's testimony need not be corroborated by the testimony of other eyewitnesses or physical evidence to sustain a conviction for sexual assault. See *People v. Cookson*, 215 Ill. 2d 194, 215 (2005) ("in many if not most child sexual abuse cases, there [is] no testimony from third-party eyewitnesses" or "physical evidence linking defendant to the alleged abuse"); see also *People v. Le*, 346 Ill. App. 3d 41, 50 (2004) (there is no requirement "that a victim's testimony be corroborated by physical or medical evidence in order to sustain a conviction for criminal sexual assault").

¶ 44    In so holding, we acknowledge certain inconsistencies between W.H.'s testimony and her videorecorded interview. For example, in her testimony, she described defendant touching her vagina with his penis, but she did not mention that uncharged conduct in her interview with Deuth. Also, while W.H. stated at trial that defendant did not touch her "butt" with his "private area" at the Loves Park residence as alleged in count III, her videorecorded statement reflects that she told Deuth that defendant touched her anus with his penis at the Loves Park residence and the Rockford residence. Ultimately, "it is for the fact finder to judge how flaws in part of the testimony affect the credibility of the whole." *Cunningham*, 212 Ill. 2d at 283. The trier of fact, moreover, may accept or reject all or part of a witness's testimony. *People v. Corral*, 2019 IL App (1st) 171501, ¶ 85. Considering the evidence as a whole, it was not unreasonable for the trial court to credit W.H.'s earlier statements, which were more proximate in time to when the offenses occurred.

¶ 45    Defendant maintains, however, that he denied the allegations at trial and that the testimony of Faber and Christy establish that he "would not have had the opportunity to commit the offenses." This argument lacks merit. Defendant's testimony was "entitled to no greater deference than the testimony of any other witness" (*People v. Barney*, 176 Ill. 2d 69, 74 (1997)), and as the trial court explained in its findings, it did not find defendant credible. Further, Faber acknowledged that he was not always at the Loves Park residence. Christy, in turn, asserted that she drove defendant to and from work, but W.H. and G.H. testified that defendant had a functional vehicle and W.H. specified that some instances of abuse occurred when she and defendant were alone. All this testimony was before the trial court, which was charged with weighing the evidence and resolving contradictions therein. See *Brown*, 2013 IL 114196, ¶ 48. The trial court's determinations were not unreasonable and we have no basis to disturb them. See *id.*

¶ 46    Defendant also posits that W.H.'s statements to Wells, Funk, and Deuth reflected "considerable adult intervention," were not corroborated by other trial evidence, and did not establish when the alleged offenses occurred or whether her outcry was timely and reliable. We disagree. In her testimony, W.H. described when the abuse occurred with reference to her age. Further, W.H.'s testimony was largely consistent with her out-of-court statements and, to the extent it was not, those inconsistencies were not fatal to the trial court's determination that she testified credibly. See *Cunningham*, 212 Ill. 2d at 283. Also, as explained *supra*, Dawn H.'s recollection of the events surrounding the day that defendant picked up W.H. to go swimming comported with statements that W.H. made in her trial testimony and in her interview with Deuth regarding defendant abusing her. Ultimately, granting the proper deference to the trial court's findings, the evidence established the essential elements of predatory criminal sexual assault of a child with sufficient specificity and defendant's arguments therefore fail. *Letcher*, 386 Ill. App. 3d at 334.

¶ 47    Finally, defendant argues that the trial court's rulings "raise the possibility of inconsistent findings" where he was acquitted of predatory criminal sexual assault of a child predicated on penis to mouth contact, but found guilty of the remaining counts "based on the same testimony" of W.H. "and no other evidence." According to defendant, "there does not seem to be a rational explanation for the inconsistent finding other than confusion." This argument also lacks merit. The record reflects that W.H. told Deuth that defendant put a towel over her eyes and put his "private part" in her mouth, but W.H. did not testify to that conduct at trial. In contrast, W.H. told Deuth that defendant penetrated her anus with his penis and penetrated her vagina with his finger, and W.H. testified to the same conduct at trial. Under these circumstances, the trial court's decision to

acquit defendant of predatory criminal sexual assault of a child predicated on penis to mouth contact was not irrational and does not impugn the court's other findings.

¶ 48 For the foregoing reasons, we affirm the judgment of the circuit court of Winnebago County.

¶ 49 Affirmed.